# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **No. 3:17-cr-124-11** |
| | **)** | **Chief Judge Crenshaw** |
| **[1] MARCUS TERMAINE DARDEN** | **)** | |
| **[11]REX ANDREW WHITLOCK** | **)** | |

## MEMORANDUM OPINION AND OMNIBUS ORDER II

On November 2, 2018, the Court entered a Memorandum Opinion and Omnibus Order (Doc. No. 823) that resolved most of the pending motions in this case. The remaining Motions were set for oral arguments or evidentiary hearings, and they were held during the last week of November 2018.

Now before the Court are the following motions filed by Rex Whitlock: (1) Motion to Suppress Evidence Obtained on March 3, 2005 (Doc. No. 553); (2) Motion to Require Immediate Production of Unredacted Witness Statements (Doc. No. 579); (3) Motion to Dismiss Count 2 of the Second Superseding Indictment (Doc. No. 573); and (4) Motion to Suppress Evidence Obtained During the Execution of a Federal Search Warrant for Defendant's Instagram Account (Doc. No. 584), all of which have been fully briefed. On November 27, 2018, the Court held an evidentiary hearing on the first motion, and heard oral arguments on the others.

Also before the Court are the following Motions filed by Marcus Termaine Darden: (1) Motion to Suppress Cell Phone Evidence (Doc. No. 636) and Supplemental Motion (Doc. No. 787); (2) Motion for Disclosure of Grand Jury Testimony (Doc. No. 590); and (3) Motion to Compel Disclosure of Confidential Informants (Doc. No. 646). Those too, have been fully briefed. On November 28, 2018, the Court held an evidentiary hearing on Darden's Motion to Suppress. The others were submitted on the papers.

# I. Whitlock's Motions

**A. Motion to Suppress March 3, 2005 Evidence**

### *1. Facts*

From the record and testimony at the evidentiary hearing, the Court finds the following facts:

On March 3, 2005, officer (now Detective) Andrew Hurst of the Clarksville Police Department ("CPD") was on patrol, wearing his police uniform and driving a marked police car. He parked his vehicle approximately 50 to 75 feet from a house located at 308 Glen Street to watch the comings and goings from the residence because he had heard from other officers that drug activity might be occurring there.

Shortly after 9:00 a.m., Hurst observed a 1987 Chevrolet Caprice Classic pull into the driveway, back out, and then back into the driveway and park partially under a carport. The carport was attached to the left side of the house, covered by a roof, and supported by two poles on the opposite side of the carport. The back wall of the house extended partially across the rear of the carport.

The residence is on a corner lot at the intersection of Glen and Vine Streets. It is surrounded by a chain link fence, but there is no gate in front of the driveway. Whitlock did not live at the home, but he may have visited the house given his acquaintance with Clinton Person, and the interest in music they shared. Person lived in the residence with his mother, Robbie Gaines, and his sister.

Because of the rumors he had heard and his curiosity piqued by the maneuvering of the Caprice, Hurst pulled his car up adjacent to the curb, with the nose of the vehicle near the driveway. Before Hurst could get out of his vehicle, however, Whitlock exited the Caprice, walked towards

Hurst, and asked him what was going on. Hurst responded that he suspected Whitlock's car might contain drugs. Whitlock then asked Officer Hurst to repeat the reason for the encounter. As Hurst was about to do so, Whitlock struck him with his fist, hitting Hurst on the head behind the left ear.

Whitlock then took off running towards Poplar Street, the next street down from the residence. After running across lawns and backyards, Whitlock was apprehended by Hurst approximately 300 feet from where the pursuit began. Whitlock was arrested for assault.

After Whitlock was secured in a patrol car, Hurst was approached by CPD Officer Eric Love who informed Hurst that Whitlock ran because there was a "cookie"[1] located in the handle of the door. Hurst was a relatively new officer and unfamiliar with the term. He approached the vehicle under the carport and looked through the driver's side window. He claims to have seen the cookie sitting in a compartment located on the driver's side door. A subsequent search revealed not only the crack cocaine cookie, but also marijuana and a set of digital scales. It is those items that Whitlock seeks to suppress.

### B. Application of Law

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Brigham City v. Stuart, 547 U.S. 398, 404 (2006) (citing Flippo v. West Virginia, 528 U.S. 11, 13 (1999)). Thus, for example, "[it]t is well established that under certain circumstances the police may seize evidence in plain view without a

---

[1] At the evidentiary hearing, Detective Hurst testified that a "cookie" in street drug parlance is crack cocaine shaped into the form of a cookie. He described the size of the cookie in this case to be somewhere between the size of a Chips Ahoy® and a Subway® chocolate chip cookie.

warrant," Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971), and it is upon that exception which the Government relies here.[2]

"The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment – or at least no search independent of the initial intrusion that gave the officers their vantage point." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) (colleting cases). "The warrantless seizure of contraband that presents itself in this manner is deemed justified by the realization that resort to a neutral magistrate under such circumstances would often be impracticable and would do little to promote the objectives of the Fourth Amendment." Id.

"Four factors must be satisfied in order for the plain view doctrine to apply: (1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object." United States v. Garcia, 496 F.3d 495, 508 (6th Cir. 2007). "What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused." Coolidge, 403 U.S. at 466. That is, an officer who "is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object' may seize it, so long as the object's incriminating nature is "immediately

_____

[2] Another is the automobile exception. That exception is inapplicable here because, in Arizona v. Gant, 556 U.S. 332 (2009), the Supreme Court held that, consistent with the Fourth Amendment, police are "authorize[d] to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." At the time Hurst looked through the drivers side window, Whitlock was detained in the back of a squad car.

4

apparent." Id. at 465–66.

In this case, Hurst did not inadvertently come across the cookie. Instead, he was directed to it by Love who, tellingly, did not testify at the hearing. How Love discovered the cookie has not been established.[3] Perhaps he saw it by peering through the door window as Hurst testified, but the Court found this testimony a bit hard to believe. The cookie sat in what can best be described as a finger well. To see it from the outside, Hurst would have had to peer down over the door panel, and look through the door strap that was attached to the door on a piece of trim. Not only that, Hurst would have had to recognize from that vantage point that what he was seeing in the finger well was an illegal object. From the Court's perspective, and based on Hurst's credibility on this issue, this is unlikely.[4]

Furthermore, Officer Love's discovery was hardly inadvertent. He responded to the scene based on an officer in pursuit call. The only reason for him to look in the car was to see if there was evidence, a point made clear when Officer Love told Detective Hurst that he knew why Whitlock ran – it was because there was a crack cocaine cookie in the door. See United States v. Rivera-Padilla, 365 F. App'x 343, 346 (3d Cir. 2010) ("The plain view doctrine does not authorize

---

[3] Also unexplained is why Love did not open the door if he saw crack cocaine in plain view. After all, "[o]fficers may search an automobile without having obtained a warrant so long as they have probable cause to do so," Collins v. Virginia, 138 S.Ct. 1663, 1670 (2018), and, "where the incriminating nature of the evidence is immediately apparent," this "provide[s] probable cause to believe that the vehicle contain[s] evidence of a crime, authorizing the officers to search the vehicle and giving them a lawful right of access to its interior." United States v. Avant, 650 F. App'x 890, 893 (6th Cir. 2016); see also, United States v. Booker, 269 F.3d 930, 932 (8th Cir. 2001) (holding that where state trooper saw marijuana on rear floorboard of Chevrolet Blazer, "[t]hat sighting generated probable cause to justify the subsequent search of the Blazer"). While Avant is a 2016 case and Collins is a 2018 case, the Sixth Circuit has long held that observing drugs in plain view in a vehicle provides probable cause to search the remainder of the car. See United States v. Burnett, 791 F.2d 64, 67 (6th Cir. 1986) (concluding that where officer saw a package of marijuana on floorboard in plain view, the officer "had every right to search the passenger area of the car, the trunk, and any and all containers which might conceal contraband").

[4] In fairness to Detective Hurst, he testified some thirteen years after the search in question.

an otherwise unauthorized search, even if it is a fruitful one."); United States v. Irizarry, 673 F.2d 554, 559 (1st Cir. 1982) ("We do not question the reasonableness of Agent Philip's suspicion that if he searched above the ceiling he might find evidence. That is not the point. What is significant is that, without any prior approval by a detached magistrate, he launched himself on an exploratory search."); United States v. Freeman, 685 F.2d 942, 954 (5th Cir. 1982) (emphasis added) ("[I]nadvertence does not require the police to be totally dumbfounded or surprised by the discovery of the incriminating evidence; the fact that its presence may be 'within the realm of foreseeable possibilities,' . . . or even expected, does not destroy inadvertence *if the police did not arrive specifically planning to look for the evidence.*").

Regardless, the plain view doctrine is inapplicable in these circumstances because neither Detective Hurst nor Officer Love had a legal right to be in the carport in the first place. Unquestionably, a home is protected by the Fourth Amendment, and its curtilage—the area "immediately surrounding and associated with the home"—is treated as "part of [the] home itself for Fourth Amendment purposes." Oliver v. United States, 466 U.S. 170, 180 (1984). "'The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.'" Collins, 138 S.Ct. at 1670 (quoting California v. Ciraolo, 476 U.S. 207, 212–13 (1986)).

The Supreme Court has stated "that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."

6

United States v. Dunn, 480 U.S. 294, 301 (1987). "But these factors are not to be applied mechanically: they are 'useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration – whether the area in question is so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection.'" Morgan v. Fairfield Cty., 903 F.3d 553, 561 (6th Cir. 2018) (quoting Dunn 480 U.S. 301). "Often that central consideration requires little more than a commonsense analysis because the concept is 'familiar enough that it is easily understood from our daily experience.'" Id. (quoting Florida v. Jardines, 569 U.S. 1, 7 (2013)).

Whether based upon the four factors or commonsense, it is clear that the carport was within the curtilage of the 308 Glenn Street residence. It is attached to the structure and a back portion of the wall is an extension of the rear, exterior wall. The house is surrounded by a fence and the carport is withing the boundaries of the fence such that one has to pass through the fence to get to the carport. Personal effects also appear to have been stored in the carport. While the carport is essentially open on three sides and objects can be seen from the street, "[s]o long as it is curtilage, a parking patio or carport into which an officer can see from the street is no less entitled to protection from trespass and a warrantless search than a fully enclosed garage." Collins, 138 S.Ct. at 1675.[5]

---

[5] In its post-hearing supplemental brief, the Government argues that officers are permitted to conduct a "knock and talk," and that "[s]uch investigation, for example, might include notifying the homeowner that the driver of the Caprice parked in the driveway had just been arrested, and determining whether anyone inside the residence knew Whitlock or was familiar with the Caprice." (Doc. No. 914 at 3). The Government continues: "It stands to reason that, if the Fourth Amendment permits Officer Hurst to walk past the Caprice to the front door of 308 Glenn and make inquiries of the residents inside, it also permits him to look into the window of the Caprice itself." Id. But there is no evidence Hurst nor Love undertook a "knock and talk." Instead, because on the testimony of Hurst, Officer Love apparently took it upon himself to go to the Caprice and look inside in an effort to see why Whitlock may have took off running. Officer Love's sole intent, so far as the Court can discern from the record, was to look for evidence.

7

On the issue of curtilage, one more matter needs to be addressed. The Government argues that Whitlock lacks standing because he had no ownership or other rights to the 308 Glenn Street residence. In fact, he did not even live in the home. After citing numerous cases that stand for the proposition that visitors lack standing to challenge the search or an apartment or home, the Government argues:

> It stands to reason that, if casual visitors who are present *inside* a searched premises lack standing to challenge a search of that premises, Whitlock lacks standing to challenge the search of a vehicle parked *outside* a premises over which he has asserted no connection at all.

(Doc. No. 66 at 4, emphasis in original).

The Government's argument is a faulty syllogism, a prologism, or both, and the conclusion does not flow from the premise. It would be one thing if Whitlock were objecting to the search of the home, but he is not. What he is objecting to is the search of a vehicle in which he was the driver and sole occupant. "[L]aw enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made." Kentucky v. King, 563 U.S. 452, 462–63 (2011). In other words, "the Fourth Amendment requires . . . that the steps preceding the seizure be lawful." Id. at 463. The "spot" from where Hurst looked through the Caprice's window was within the curtilage of a home and a place where neither he nor Love had a right to be.[6]

Accordingly, Whitlock's Motion to Suppress Evidence Obtained on March 3, 2005 (Doc. No. 553) is **GRANTED** and the evidence seized from the Caprice at 308 Glenn Street will **NOT BE** admitted at trial.

---

[6] At the evidentiary hearing, Hurst also invoked the exigent circumstances exception to the warrant requirement. He quickly backed off that assertion, though, once he was reminded that, at the time of the search, Whitlock was arrested, cuffed, and sitting in the back of a patrol car.

8

**B. Motion to Require Production of Unredacted Statements**

This motion was substantially resolved prior to the hearing with the exception of contact information for certain witnesses. The parties were directed to jointly call the prospective witnesses and, for those that agreed to be interview by defense counsel, arrange a neutral location for the interview. Accordingly, Whitlock's Motion to Require Immediate Production of Unredacted Witness Statements (Doc. No. 579) is **DENIED AS MOOT.**

**C. Motion to Dismiss Count II**

In Count Two of the Third Superseding Indictment, nine Defendants, including Whitlock, are charged with conspiring to distribute and possessing intent to distribute controlled substances. Count Two reads:

> Beginning on a date unknown but at least as of in or about 2005, and continuing through the return date of this Indictment [April 19, 2018], in the Middle District of Tennessee and elsewhere, the defendants, **[1] MARCUS TERMAINE DARDEN, [2] MAURICE DUNCAN BURKS, [4] LAMAR ANDRE WARFIELD, [5] DERRICK LAMAR KILGORE, [6] ELANCE JUSTIN LUCAS, [7] DECARLOS TITINGTON, [8] LAWRENCE MITCHELL, [9] LORENZO CORTEZ BROWN, [11] REX ANDREW WHITLOCK, and [12] JAMES ANDERSON LUKE**, did combine, conspire, confederate, and agree, together and with others known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute five kilograms or more of cocaine hydrochloride; 280 grams or more of cocaine base, that is, crack cocaine; oxycodone; methadone; and hydrocodone, all Schedule II controlled substances; and marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).
>
> All in violation of Title 21, United States Code, Section 846.

(Doc. 380 at 21-22).

Whitlock seeks to dismiss Count Two on double jeopardy grounds because he has previously been convicted of conspiracy in a federal case filed in the United States District Court for the

Western District of Kentucky.  In that case, Count One reads:

> From in or about June 2007, to in or about June 2009, in the Western District of Kentucky, Christian County, Kentucky, and elsewhere, the defendants, **AMANDA ELAINE BUSH, MARVIN EUGENE ACREE, DANOIS LAMOND ALLEN, LARTAVIOUS MONTREAL BANKS, ALAJOWAN BURKS, JAMES LAMONTE DUNBAR, COREY LAMONTE GRAY, MARCUS EDWARD HARRIS, ANTHONY HESTER, CHARLES EUGENE JONES JR., DWAYNE MICHAEL JOSEPH JR., RODNEY EDWARD MOORE, ALVIN WAYNE QUARLES, PERRY MONCELL REDD, DEVONA MICHELLE RILEY, CAMEYON DARON ROBERTS, LAMON DERON WATKINS, RONNIE GENE WHALEY, REX WHITLOCK, DEMETRIUS CORTEZ WILLIAMS, and DONALD CARLYLE WILLIAMS**, conspired and agreed with each other and with other persons, both known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute fifty grams or more of a mixture and substance containing cocaine base, commonly known as "crack," a Schedule II controlled substance, as defined in Title 21, United States Code, Section 812, in violation of Title 21, United States Code, Section 841(a)(1).

> All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A).

(Doc. No. 574-e at 3-4).

The Fifth Amendment prevents persons "subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V.  "That clause protects criminal defendants from prosecution following conviction or acquittal for the same offense, and also prohibits infliction of 'multiple punishments for the same offense imposed in a single proceeding.'" Jones v. Harry, 405 F. App'x 23, 28 (6th Cir. 2010) (quoting Jones v. Thomas, 491 U.S. 376, 381 (1989)).

The "totality of circumstances" determines whether successive indictments charge the same drug conspiracy for purposes of double jeopardy, and this analysis is guided by consideration of five factors: "(1) time; (2) persons acting as co-conspirators; (3) the statutory offenses charged in the indictments; (4) the overt acts charged by the government or any other description of the offenses charged which indicates the nature and scope of the activity which the government sought to punish in each case; and (5) places where the events alleged as part of the conspiracy took place." United

States v. Sinito, 723 F.2d 1250, 1256 (6th Cir. 1983). "Where several of these factors differ between the conspiracies, the conclusion follows that the alleged illegal conspiracies are separate and distinct offenses." Id. Because most of the relevant factors are different between this case and the Kentucky case, the Court finds no double jeopardy bar.

First, the present case and the Kentucky case involve completely different time frames. Here, the conspiracy is alleged to have began "on a date unknown but at least as of in or about 2005, and continuing through" the return of the Superseding Indictment on April 19, 2018, whereas the Kentucky case charges a conspiracy "beginning on a date unknown to the Grand Jury, and continuing until on or about August 22, 2008," meaning that the conspiracy alleged here lasted at least ten years longer than in the Kentucky case.

The fact that Whitlock was arrested on the Kentucky charges in 2008 and has remained in custody since then does not change things because of the nature of a conspiracy. As this Court pointed out in its prior Memorandum Opinion and Omnibus Order:

> "'Mere cessation of activity is not sufficient' to establish withdrawal from a conspiracy . . . , and a defendant's arrest or incarceration does not qualify as an affirmative, volitional act of withdrawal." United States v. Robinson, 390 F.3d 853, 882 (6th Cir. 2004) (internal citations omitted); see also United States v. Johnson, 737 F.3d 522, 526 (8th Cir. 2013) ("Incarceration alone does not constitute withdrawal."); United States v. Riddle, 249 F.3d 529, 539 (6th Cir. 2001) (stating that the "mere fact of . . . incarceration is insufficient to establish the volitional act necessary for withdrawal" from a conspiracy); United States v. Gonzalez, 940 F.2d 1413, 1427 (11th Cir. 1991) ("[N]either arrest nor incarceration automatically triggers withdrawal form a conspiracy.").

United States v. Darden, No. 3:17-CR-00124, 2018 WL 5784057, at *22 (M.D. Tenn. Nov. 2, 2018). If, as Whitlock appears to be claiming, he withdrew from the drug conspiracy based upon his incarceration, this is an "affirmative defense that must be proven by him at trial." Id. (citing Smith v. United States, 568 U.S. 106, 110 (2013); United States v. Payne, 962 F.2d 1228, 1234 (6th Cir.

1992)).

Second, the alleged players are different. This case involves alleged members of the Gangster Disciples, whereas the Kentucky case involved members of the "Williams Brothers" crack cocaine conspiracy. None of the defendants (save Whitlock) are the same, and the only connection between players appears to be that Alajowan Burks (who was charged in the Kentucky case) is the brother of Maurice Burks (who is charged as a conspirator in this case). "The rule [against double jeopardy] does not apply where there are two distinct conspiracies, even though they may involve some of the same participants." Sinito, 723 F.2d at 1257 (brackets in original] (quoting United States v. Lurz, 666 F.2d 69, 74 (4th Cir. 1981)).

Third, both this case and the Kentucky case charge drug conspiracies in violation of 18 U.S.C. § 846, and the same underlying statutory offense, 18 U.S.C. § 841(a). However, "even if 'the statutory offenses charged are the same, . . . in context with the other factors, this is a minor point, since one can certainly enter two conspiracies to commit the same type of crime.'" United States v. Wheeler, 535 F.3d 446, 456 (6th Cir. 2008) (quoting United States v. Ledon, 49 F.3d 457, 460 (8th Cir.1995)). This is particularly true since the Kentucky indictment was limited to crack cocaine while the allegations here include a cornucopia of drugs. See United States v. Kitchen, 428 F. App'x 593, 596 (6th Cir. 2011) (finding no double jeopardy bar where "the two conspiracies involved different (although overlapping) time periods, different (although perhaps overlapping) locations, and different types of drugs").

Fourth, the nature and scope of the activity that the Government seeks to punish is different. Here, the Third Superseding Indictment targets activities of the Gangster Disciples in and around Clarksville, Tennessee, including drug trafficking activities. As it relates specifically to Whitlock,

12

the Government represents that he was involved in obtaining kilogram quantities of powder cocaine from his source in Atlanta, and cooking, packaging, and distributing controlled substance in Clarksville. In the Kentucky case, Whitlock pled guilty to conspiring to distribute more than fifty grams of crack cocaine because he facilitated a single sale of 141.5 grams of crack cocaine to an informant in that case.

Fifth, the locations are different. In Kentucky, the alleged conspiracy operated in Hopkinsville, Kentucky and the surrounding counties. In this case, the Government claims the proof will show that the conspiracy involved conduct not only in Clarksville, but other states, including Georgia, Tennessee, and Indiana.

In addition to the Kentucky charges, Whitlock claims that double jeopardy bars this case because he was also indicted for a drug conspiracy in the Northern District of Georgia styled United States v. Whitlock, Case No. 4:08-cr-44 (N.D. Ga. 2008). In that case, Defendant pled guilty to Count One, which charged:

> Beginning on a date unknown to the Grand Jury, and continuing until on or about August 22, 2008, in the Northern District of Georgia, the defendants, **REX ANDREW WHITLOCK and TRAY DEANDREA GALBREATH**, did willfully combine, conspire, confederate, agree, and have a tacit understanding with each other and with persons unknown to the Grand Jury, to violate Title 21, United States Code, Section 841(a)(1), that is, to possess with intent to distribute at least 5 kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, all in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A)(ii).

(Doc. No. 676 at 1).

For two reasons, it is unnecessary to discuss Whitlock's double jeopardy claim relating to the Georgia Indictment in any detail. First, at the hearing on November 27, 2018, the Government represented that it did not intend to present any evidence during its case-in-chief about the facts and circumstances surrounding the Georgia Indictment. Second, even without that concession, the

Georgia case and this case are vastly different in regard to the relevant factors: (1) the conspiracy in Georgia lasted until August 2008, while the alleged conspiracy here continued on for another ten years; (2) the Georgia case named only Whitlock and Deandrea Galbreath, who is not charged here; and (3, 4, & 5) the Georgia case involved Whitlock's participation in conspiring to distribute powder cocaine found in a Pontiac Bonneville during a traffic stop, unlike the alleged ongoing conspiracy here involving assorted illegal drugs.

Accordingly, Whitlock's Motion to Dismiss Count 2 of the Second Superseding Indictment (Doc. No. 573) is **DENIED**. Insofar as evidence is presented regarding the Kentucky Indictment, the jury will be given an appropriate limiting instruction.

## D. Motion to Suppress Regarding Instagram Account

Whitlock next moves to suppress evidence obtained during the execution of a federal search warrant on an Instagram account where items were posted under the sobriquet "therealstackhouse."[7] He argues that insufficient evidence was provided to Magistrate Judge Frensley to support probable cause because the affiant, Special Agent Adam Daniels of the Bureau of Alcohol, Tobacco and Firearms ("ATF"), offers only conclusory assertions; purportedly relies on information from unidentified sources; and fails to establish that evidence of criminal activity would be found on the Instagram account.

The affidavit in support of the search warrant is 17 pages long, consisting of 53 paragraphs. Length does not matter, of course; substance does. The issuing judge must answer "the

---

[7] As a preliminary matter, the Government challenges Whitlock's standing to challenge the search because he has made no affirmative showing that the account was his. The short answer to this is that the Government, through Agent Daniels, affirmatively represented to Magistrate Judge Frensley that "Whitlock maintains or maintained a public Instagram account with the username 'therealstackhouse," and that Whitlock made numerous postings to the account. (Doc. No. 568-11 at 11). Indeed, an entire section of the affidavit is under the heading "Rex Whitlock's Instagram Account." Id.

14

commonsense practical question whether there is 'probable cause to believe that contraband or evidence is located in a particular place.'" Illinois v. Gates, 462 U.S. 213, 230 (1983).

The undersigned was not the issuing judge and, therefore, review is limited. The Supreme Court has "repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review." Id. at 236. Instead, "reviewing courts are to accord the magistrate's determination 'great deference." United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000). "Consequently a magistrate's decision to grant a search warrant should only be reversed if it was arbitrarily exercised." United States v. Greene, 250 F.3d 471, 478–79 (6th Cir. 2001) (citing Allen, 211 F.3d at 973; United States v. Finch, 998 F.2d 349, 352 (6th Cir. 1993)). Furthermore, "courts should review the sufficiency of the affidavit in a commonsense, rather than hypertechnical manner," and consider the "totality of the circumstances." Id.

In the supporting affidavit, Agent Daniel began by explaining his background, including that he had been an agent with the ATF since March 2016, and that he has conducted assorted investigations into criminal activity, including controlled substances offenses and gang and racketeering offenses. The next 5½ pages of Agent Daniels' affidavit overviewed the Gangster Disciples' organization. This included outlining its organizational structure and hierarchy (including the various titles of the upper-level leadership in the Middle District of Tennessee); the areas under its control in Clarksville; how one became a member (including recruitment efforts); what occurs at meetings; Gangster Disciples' terminology; the use of certain names and symbols to signify membership, oftentimes through tattoos; identification of the Gangster Disciples' sworn enemies; the purposes of the Gangster Disciples, not the least of which was to enrich its members; and the use of threats, intimidation, and violence to preserve and protect power.

15

Next, Agent Daniels identified Whitlock's affiliation with the Gangster Disciples, noting that he appeared on dues rosters dating back to 2007 under the alias "Stack" and "Stackhouse"; that he rose to power in the mid-2000s after securing a drug supplier in Atlanta; that he made numerous drug runs between Atlanta and Clarksville procuring kilogram quantities and carrying between $30,000 and $40,000 in cash; that he cooked cracked and sold from residences in Clarksville (often while armed); that he was arrested in Georgia during one of those drug runs; and that he has maintained his affiliation with the Gangster Disciples after his imprisonment, including posting videos on Facebook accounts, emailing fellow gang members, possessing gang literature, and obtaining new gang tattoos. Agent Daniels' affidavit next describes Whitlock's Instagram account noting that, while in federal custody, Whitlock posted several pictures of himself, along with Gangster Disciples' phrases, acronyms and gang signs. Finally, before identifying what was to be searched and seized, Agent Daniels' described how Instagram is used and how it operates.

Even a cursory review makes clear that Agent Daniels' affidavit was not woven out of whole cloth. To be sure, he appears to rely on informants for some of the information, and may have utilized language regarding the Gangster Disciples organization that has appeared in the past. But, "independent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause," United States v. McCraven, 401 F.3d 693, 698 (6th Cir. 2005), and "an affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." United States v. Coffee, 434 F.3d 887, 893 (6th Cir. 2006) (citation omitted); see also United States v. Tuttle, 200 F.3d 892, 894 (6th Cir. 2000) (noting that "information received from an informant whose reliability is not established may be sufficient to create probable cause when

there is some independent corroboration by the police of the informant's information"). Likewise, "the fact that an affidavit contains some 'boilerplate' language is not *per se* problematic so long as the affidavit also contains sufficient 'specificity' to satisfy probable cause." United States v. Moore, 661 F.3d 309, 316 (6th Cir. 2011).

The specifics here are that Whitlock, believed to be a member of the Gangster Disciples and all that its membership entails, utilized an Instagram account attributed to him to post items that suggested his continued affiliation and support of that organization. To establish its RICO case, it is incumbent upon the Government to establish the existence of an enterprise and Whitlock's association with that enterprise. Sinito, 723 F.2d at 1260. Viewed "in a commonsense fashion," United States v. Ware, 338 F.3d 476, 482 (6th Cir. 2003), Agent Daniels' affidavit provided probable cause to believe that further evidence of Whitlock and others' association with the Gangster Disciples could be found in the Instagram account. This is particularly true because, as the Supreme Court has repeatedly stated, "[p]robable cause . . . is not a high bar: It requires only the 'kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" Kaley v. United States, 571 U.S. 320, 338 (2014) (quoting Florida v. Harris, 133 S.Ct. 1050, 1055 (2013)).

"Because probable cause 'deals with probabilities and depends on the totality of the circumstances,'" District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018), it can hardly be said that, under the totality of the circumstances and viewed in a commonsense manner, Magistrate Judge Frensley was provided with insufficient information to "indicate a fair probability that evidence of a crime w[ould] be located on the premises of the proposed search.'" United States v. Hines, 885 F.3d 919, 923 (6th Cir. 2018) (quoting United States v. Dyer, 580 F.3d 386, 390 (6th Cir. 2009)).

17

And, it most certainly cannot be said that Magistrate Judge Frensley "exercised his authority arbitrarily," United States v. Church, 823 F.3d 351, 354 (6th Cir. (2016), by issuing the search warrant. Accordingly, Whitlock's Motion to Suppress Evidence Obtained During the Execution of a Federal Search Warrant for Defendant's Instagram Account (Doc. No. 584) is **DENIED**.

## II. Darden's Motions

### A. Motion to Suppress Cell Phone Evidence

#### 1. Facts

Based upon the record and the testimony received at the evidentiary hearing on November 28, 2018, the Court finds the following facts:

On June 29, 2017, Kevin Cruce, an ATF Agent, and at least ten other law enforcement officers were tasked with executing an arrest warrant on Darden. This was as a result of an Indictment returned the same day charging Darden and ten others with assorted crimes, including a long-lasting racketeering conspiracy involving the Gangster Disciples, and a conspiracy to distribute a wide range of Schedule II controlled substances (including cocaine, crack cocaine and hydrocodone) that lasted more than a dozen years.

Agent Cruce learned that Darden resided or stayed in Hopkinsville, Kentucky, and either owned or worked at the Blue Magic Car Wash in that city. The Blue Magic Car wash is a small operation, consisting of an open stall where vehicles are hand washed and detailed, and an adjacent office.

Because of its location, surveillance of the car wash was not an option, and so a marked police unit was sent to the site to insure that Darden was there. Once that was confirmed, agents and officers proceeded to the location *en masse*. All law enforcement officers were wearing identifying

18

vests or uniforms, and some were in full SWAT regalia.

When officers arrived, there was a sedan parked in the car wash stall. Four to six individuals were milling about, either in the stall or directly adjacent thereto. Darden was closest to the vehicle, standing most likely five feet, but no more than ten feet, away.

All of the individuals were ordered to the ground. Darden was arrested and placed in handcuffs. A search of his person revealed a plastic baggie containing marijuana, and $900 in cash.

After Darden was secured, Agent Cruce noticed two iPhones sitting on top of the vehicle parked in the car wash stall. Either by merely picking it up, or by pressing the home button, Agent Cruce saw a picture of Darden and a child on the home screen of the first iPhone ("iPhone 1"). On the second ("iPhone 2"), he saw what appeared to be some sort of beach scene on the home screen. The iPhones were covered with substantially identical, if not the same skins. Agent Cruce placed both phones in airplane mode to prevent manipulation.

Agent Cruce asked Darden (who by now was standing) about the iPhones. At that point, Darden had yet to be given his *Miranda* warnings.[8] Darden admitted to ownership of iPhone 1, but claimed not to know its password. He denied ownership of iPhone 2. Agent Cruce then asked the other individuals at the car wash about iPhone 2, but all denied ownership.

Because Darden was closest to the iPhones when officers swarmed onto the scene, and because he admitted ownership of iPhone 1 and ownership of iPhone 2 (which was sitting either on top of or adjacent to iPhone 1) was disclaimed by all, Agent Cruce seized both. Based on his extensive experience as an ATF agent (11 years) and his training, Agent Cruce knew that cell phones are often used by drug dealers. He also knew that Darden had been indicted in a wide-ranging

_____

[8] Miranda v. Arizona, 384 U.S. 436 (1966).

conspiracy to distribute drugs.

### 2. Application of Law

Darden seeks to suppress both iPhones as being unlawfully seized.[9]  He also seeks to suppress the statements he made admitting to ownership of iPhone 1 and, consequently, both phones under the fruit of the poisonous tree doctrine.  The Court considers the arguments in turn.

### a) *Seizure of the Phones*

The Government first argues Darden lacks standing as to iPhone 2.  It also argues the iPhones were lawfully seized, either as a search incident to arrest or under the plain view doctrine.  The Court finds it unnecessary to address the standing issue because the Court agrees with the last argument advanced by the Government.

The Government's assertion that the phones were lawfully seized under the search incident to arrest exception to the Fourth Amendment's warrant requirement is a nonstarter.   The Supreme Court has described the exception as follows:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape.  Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. . . . There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."

Chimel v. California, 395 U.S. 752, 762-763 (1969).  As should be evident, "the exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations."  Gant, 556 U.S. at 338.  "If there is no possibility that an arrestee could reach into the

---

[9]  Darden's motion is directed at the *seizure* of the phones.  A subsequent *search* of the phones was conducted pursuant to a warrant issued by Magistrate Judge Frensley on January 30, 2018.  (Doc. No. 636-2).

area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." Id. That is the case here.

Even if Darden was not cuffed and surrounded by officers, the iPhones were not in his immediate vicinity – they were at least five, if not ten, feet away. See United States v. Hudson, 405 F.3d 425, 432 (6th Cir. 2005) (characterizing "immediate vicinity as begin within a suspect's wingspan"). But, being cuffed and surrounded, there was no possibility that Darden could have retrieved the phones.

Turning to the plain view exception, the relevant four factors were identified earlier in this opinion. Only the one of those factors – the object's incriminating nature must be immediately apparent – is at issue regarding Darden's motion.

The Supreme Court's requirement in Coolidge that the incriminating nature of seized items be immediately apparent was "very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." Texas v. Brown, 460 U.S. 730, 741 (1983). Indeed, the Sixth Circuit "has long deliberated what 'immediately apparent' means." United States v. McLevain, 310 F.3d 434, 441 (6th Cir. 2002). "That said, that the incriminating nature of the evidence be immediately apparent 'is necessary to prevent officers from using the plain view doctrine as a means to extend a particularized search authorized by Fourth Amendment principles into an unlawful exploratory search." United States v. Pacheco, 841 F.3d 384, 395 (6th Cir. 2016) (quoting United States v. Garcia, 496 F.3d 495, 510 (6th Cir. 2007)). To assist in determining whether an object's incriminatory nature is immediately apparent, the Sixth Circuit "looks to three factors, none of which is necessary but each of which is instructive." Id. These factors are:

(1) a nexus between the seized object and the [suspected criminal activity]; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; and (3) whether the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.

Id. (quotations and citations omitted); see also United States v. Chandler, 437 F. App'x 420, 427–28 (6th Cir. 2011).  Furthermore, for a plain view seizure to be proper, "the Supreme Court does not require that officers know that evidence is contraband. . . . [Probable cause] merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property *or useful as evidence of a crime*.'" McLevain, 310 F.3d at 441 (emphasis added).

In his initial brief, Darden notes that "millions of iPhones have been sold" (Doc. No. 636 at 5) and, in his post-hearing supplemental brief, that "there is nothing about the intrinsic nature of a cell phone that makes immediately apparent that it is contraband."  (Doc. No. 912 at 3).  As such, he submits the seizure of the iPhones in this case was unlawful.

Similar arguments have been considered and rejected by the courts.  For example, in United States v. Conlan, 786 F.3d 380 (5th Cir. 2015), the Fifth Circuit upheld a seizure under the plain view exception over defendant's argument that "phones and laptops are used everywhere," and there was "nothing inherently incriminating about a cellphone or a laptop in a hotel room," because the officer who seized the items knew defendant had engaged in "harassing electronic communications." Similarly, in United States v. Key, 889 F.3d 910, 913 (7th Cir. 2018), the Seventh Circuit upheld the plain view seizure of a cell phone, laptop and other items during search for a missing 15-year old, because "[m]ultiple cell phones, prepaid credit cards, and condoms are all things typically used for prostitution."  Also in United States v. Babilonia, 854 F.3d 163, 180 (2d Cir. 2017), the Second

Circuit upheld the seizure of cell phones and a tablet, notwithstanding defendant's arguments about "research suggest[ing] that virtually every adult in the United States owns a cell phone," because defendant had been investigated for months, and the investigation revealed that the alleged conspiracies (including a drug conspiracy) involved the use of multiple cell phones.

Here, of course, Darden is not alleged to have been involved in utilizing the phones to engage in harassing conduct, or to promote prostitution, but the same principles apply to alleged drug traffickers. Agent Cruce knew that Darden was alleged to have participated in a drug conspiracy with fellow member of the Gangster Disciples, and it was apparent to him that the cell phones were used in that trade. As this Court recently pointed out in relation to a Motion to Suppress filed by co-Defendant DeCarlos Titington:

> Without question, cell phones are ubiquitous nowadays. Indeed "[t]here are 396 million cell phone service accounts in the United States – for a Nation of 326 million people." Carpenter v. United States, 138 S. Ct. 2206, 2211, 201 L. Ed. 2d 507 (2018). But (1) [Defendant's] envisioned parade of horribles involving "an entire category of personal property [that would be] left without any Constitutional protection against seizure" because "practically everyone either owns or has access to a cell phone in the United States," (Doc. No. 578 at 3), and (2) his reliance on Riley's[10] observation that "[i]t would be a particularly inexperienced or unimaginative law enforcement officer who could not come up with several reasons to suppose evidence of just about any crime could be found on a cell phone," ignores the realities of this case.

> *          *          *

> . . . The standard is not whether a casual bystander would deem the evidence incriminating, but whether it is "immediately apparent to the police that they have evidence before them." Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971). Not to put too fine a point on it but, ''[r]eminiscent of the infamous bank robber, Willie Sutton's, reply when asked why he robbed banks ('[b]ecause that's where the money is'), the business of illegal drug commerce is conducted on cellphones." United States v. Hall, 603 F. Supp. 2d 1308, 1313 (D. Colo. 2009) ; see also, United States v. Hammett, 555 F. App'x 108, 110 (2d Cir. 2014) (noting that defendant was also

---

[10] Riley v. California, 134 S. Ct. 2473, 2492 (2014).

found with a digital scale and two cell phones, "which are tools that drug dealers often possess"); United States v. Portalla, 496 F.3d 23, 27 (1st Cir. 2007) (stating that cell phones were "essential tools" of defendants' drug trade); United States v. Hernandez, 17 F. App'x 464, 467 (7th Cir. 2001) (identifying pagers and cell phones as tools of the drug trade); United States v. Hernandez-Dominguez, 1 F. App'x 827, 832 (10th Cir. 2001) ("Pagers and cell phones, again, while not dispositive, may be indicative of illegal activity because they are known tools of the drug trade.").

United States v. Titington, No. 3:17-CR-00124-7, 2018 WL 6019649, at *2–3 (M.D. Tenn. Nov. 16, 2018); see also United States v. Delva, 13 F.Supp.3d 269, 276 (S.D.N.Y. 2014) ("Courts have routinely denied motions to suppress the seizure of cell phones, in the context of narcotics conspiracies, based on knowledge that the phones may contain contacts and other evidence of a crime."); United States v. Reyes, No. 3:06CR120 (SRU), 2007 WL 419636, at *6 (D. Conn. Jan. 30, 2007) ("It was immediately apparent to [the] trained DEA agent with over ten years of law enforcement experience, that cellular telephones contain caller logs, text messages, phone books and other information that would be highly relevant to a drug prosecution and would be very likely connected with criminal activity.").

The iPhones seized on June 29, 2017 will not be suppressed because they were properly seized pursuant to the plain view exception to the Fourth Amendment's warrant requirement.

### b. *Statements Regarding i-Phones*

"Before the police may interrogate a suspect in custody, they must first read the *Miranda* warnings." United States v. Pacheco-Lopez, 531 F.3d 420, 423 (6th Cir. 2008). "An 'interrogation' comprises 'not only [ ] express questioning, but also any words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect.'" Id. (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).

Acknowledging as much, the Government argues that *Miranda* is not an issue because those

"warnings are not required 'for questions reasonably related to the police's administrative concerns,'" such as questions about "the defendant's name, address, height, weight, eye color, date of birth[,] and current address, [or] for questions 'normally attendant to arrest and custody.'" (Doc. No. 825 at 3, citation omitted). However, "[t]his 'booking exception' to *Miranda* requires the reviewing court to carefully scrutinize the facts, as '[e]ven a relatively innocuous series of questions may, in light of the factual circumstance and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response.'" Pacheo-Lopez, 511 F.3d at 523-24 (quoting United States v. Avery, 717 F.2d 1020, 1025 (6th Cir. 1983)). "Where the booking exception does not apply to statements made before administration and voluntary waiver of Miranda rights, those statements are 'irrebuttably presumed involuntary' and must be suppressed." Id. at 524 (quoting United States v. Mashburn, 406 F.3d 303, 306 (4th Cir. 2005)).

Here, the factual circumstances were such that Agent Cruce thought it "immediately apparent" that one or more of the cell phones was likely used by Darden in the drug trade. It is a bit incongruous now for the Government to argue that, given this belief, Agent Cruce thought it unlikely that asking Darden about the cell phones would not illicit an incriminating response. Therefore, Darden's statements regarding ownership of the cell phones will be suppressed. It does not follow, however, that the i-Phones, too, are subject to suppression as poisonous fruit.

"'Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation.'" United States v. Smith, 386 F.3d 753, 763 (6th Cir. 2004) (quoting United States v. Miller, 146 F.3d 274, 280 (5th Cir. 1998)). "The doctrine ensures that the government

25

cannot achieve indirectly what it is forbidden to accomplish directly." United States v. Leake, 95 F.3d 409, 411–12 (6th Cir. 1996). "At the same time, evidence obtained from an illegal search does not become "sacred and inaccessible,'" id. at 412, and there are several exceptions to the fruit of the posonous tree doctrine and the exclusionary rule, see United States v. McClain, 444 F.3d 556, 564 (6th Cir. 2005) (identifying three exceptions).

"One exception, relied upon by the government, is the inevitable-discovery doctrine, which provides that evidence secured through unlawful means is admissible if the prosecution can show that it 'ultimately or inevitably would have been discovered by lawful means[.]'" United States v. Figueredo-Diaz, 718 F.3d 568, 574 (6th Cir. 2013) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). "For example, if a defendant's coerced statement leads police to recover a dead body, evidence of the body, including its condition as shown by the autopsy, is admissible at trial if the prosecution shows that the body would have been discovered lawfully, by other means such as a volunteer search already underway that would have covered the field where the body was located." Id. "The doctrine demonstrates the exclusionary rule's aim of deterrence: for even where discovered evidence is the undoubted product of illegality, '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . .[,] then the deterrence rationale has so little basis that the evidence should be received.'" Id. at 574-75 (quoting Nix, 467 U.S. at 444).

Here, there is no doubt that the phones would have been seized and their owners identified, regardless of what Darden said or did not say at the scene. Except for Darden, no one claimed ownership of the phones. Given such circumstances, and as Agent Cruce convincingly explained, the iPhones would have been taken into custody for safekeeping.

26

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Brigham City 547 U.S. at 403(2006). Because of Darden's proximity to the phones, Agent Cruce's knowledge of the charges Darden faced, and the failure of any of the others to claim ownership of the i-Phones, it was eminently reasonable for Agent Cruce to seize the phones.

Accordingly, Darden's Motion to Suppress Cell Phone Evidence (Doc. No. 636) and his Supplemental Motion (Doc. No. 787) is **GRANTED IN PART** and **DENIED IN PART**. His Motion is **GRANTED** with respect to any statements he may have made regarding ownership of the iPhones prior to being read his *Miranda* rights. Those statements will not be introduced at trial. The Motion is **DENIED** insofar as Darden challenges the seizure of the iPhones.

## B. Motion for Disclosure of Grand Jury Testimony

By way of this Motion, Darden request that the Court "order the Government to disclose to the defense two months prior to trial all Grand Jury testimony in this case." (Doc., No. 590 at 1). That request is made pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure.

"It has long been recognized that grand juries require a generous zone of secrecy in order to perform their investigative functions." United States v. Rutherford, 509 F.3d 791, 795 (6th Cir. 2007). Indeed, since 1946 the secrecy of grand jury proceedings has been governed by Rule 6(e) which provide that grand jury transcripts and subpoened documents shall remain secret unless the court authorizes disclosure. "The scope of that authority has been delineated in a series of cases setting forth the standard of 'particularized need.'" Illinois v. Abbott & Assocs., Inc., 460 U.S. 557, 567 (1983). Simply put, "[p]arties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured

to cover only material so needed." <u>Douglas Oil Co. v. Petrol Stops Northwest</u>, 441 U.S. 211, 221 (1979).

Darden does not come close to meeting his "heavy burden of showing particularized need." <u>FDIC v. Ernst & Whinney</u>, 921 F.2d 83, 87 (6th Cir. 1990). He simply argues:

> If ever there was a case in which there existed a 'particularized need' for the pretrial disclosure of grand jury testimony, it is this case. Mr. Darden is not alone in the difficulties he faces in preparing his defense. His complaints are echoed in the chorus form other defense counsel in this case about the excessive redactions in the Government's discovery disclosures and a collective sense of being "in the dark."

(Doc. No. 590 at 2). He makes no attempt to limit his request for disclosure to only that which is necessary, nor does he show that his need for disclosure is greater than the need for secrecy. <u>See</u> <u>In re Antitrust Grand Jury</u>, 805 F.2d 155, 160-161 (6th Cir. 1986) ("A party requesting grand jury information must show the need 'with particularity' so that 'the secrecy of the proceedings [may] be lifted discreetly and limitedly.'").

Accordingly, Darden's Motion for Grand Jury Testimony (Doc. N. 590) is **DENIED**.

C. **Motion to Compel Disclosure of Confidential Informants**

Finally, Darden requests that the Government disclose its confidential informants, and specifically those alleged to have purchased crack cocaine from him on January 24, April 4, and June 17, 2014. The basis for this request is two-fold.

First, Darden makes the request under Tennessee Board of Professional Responsibility Formal Ethics Opinion 2017-F-163 that interprets Tennessee's Rule of Professional Conduct 3.8(d) as requiring prosecutors to disclose immediately all information favorable to an accused. This Court has independent authority to determine the minimum standards of professional conduct before the Court. However, the Tennessee Supreme Court on November 18, 2018 stayed that Formal Ethics

28

Opinion pending further review. Accordingly, this provides no independent basis for disclosure.

Second, Darden makes the request based on the "general proposition [that] a witness is not the exclusive property of either the government or the Defendant." (Doc. No. 646 at 2). While acknowledging that "[g]enerally, the government has a privilege not to disclose the identity of confidential informants," Darden pont out that "[i]t must yield where disclosure of the informer's identity or the content of his communication is relevant and helpful to the defense of an accused or is essential to a fair determination of a cause." (Id. at 1-2). Such is the case here, Darden submits, because he and the informant "(if the allegations are true) were the sole participants in the transaction. This means that the informant is truly the only person who can either amplify or contradict the testimony of any government agents." (Id. at 3).

Darden's argument appears to be based upon a faulty premise. Leaving aside for the moment the Government's representation that recently intercepted jail calls between Darden and co-Defendant Burks make clear that Darden already knows the identity of the informant who purchased the drugs, the Government states that ATF Reports of Investigation ("ROIs") were provided in discovery on July 28, 2017. Those ROIs detail the controlled buys. Additionally, on that same date, Darden was provided with all of the recordings surrounding the buys, including recorded phone calls, undercover recordings, and surveillance videos. Thus, it does not appear that Darden and the informant are the only individuals who can "amplify or contradict the testimony of any Government agents."

Given that the transactions were either audio or video recorded, it may be that the Government will not even need to call the informant as a witness at trial. If it does, only then will the informant be a witness and subject to the disclosure requirements set forth in Giglio v. United

29

States, 405 U.S. 150 (1972) and the Jenks Act, 18 U.S.C. § 3500. Darden has pointed to nothing that supports the notion that witnesses need to be disclosed three to four months before trial, particularly since the Government has raised security concerns about its witnesses.

The informant privilege, recognized by the Supreme Court in Roviaro v. United States, 353 U.S. 53 (1957), is "said to be uniquely available to the government . . . to withhold from disclosure the identity of persons who furnish to law enforcement personnel information concerning violations of law, Holman v. Cayce, 873 F.2d 944, 946 (6th Cir. 1989). "By preserving their anonymity, the privilege fosters the public's interest in effective law enforcement by encouraging citizens to communicate to the government information regarding the commission of crimes." Id.

This privilege, however, is limited by the fundamental requirement of fairness. "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." Roviaro, 353 U.S. at 60-61. However, "'[m]ere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure.'" United States v. Hammons, 411 F. App'x 837, 843 (6th Cir. 2011) (quoting United States v. Sharp, 778 F.2d 1182, 1187 (6th Cir. 1985)). The burden is on a defendant to show that disclosure of the informant's identity is appropriate. Id.

Here, Darden has not "show[n] how disclosure of the informant would substantively assist his defense," United States v. Moore, 954 F.2d 379, 381 (6th Cir. 1992), particularly given the Government's representations about the discovery that was provided, and Darden's failure to rebut those representations. That Darden may already know the informant's identity does not change things. "[S]o long as some potential harm from further disclosure or publication remains, the

30

government retains an interest in non-disclosure" because relying on defendant's or co-conspirator's word "is very different from relying on the government's word." <u>United States v. Sierra-Villegas</u>, 774 F.3d 1093, 1098 (6th Cir. 2014).

Accordingly, Darden's Motion to Compel Disclosure of Confidential Informants (Doc. No. 646) is **DENIED**.

IT IS SO ORDERED.

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE