# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:17-cr-00124 |
| [1] MARCUS TERMAINE DARDEN | ) | |
| [2] MAURICE DUNCAN BURKS | ) | |
| [5] DERRICK LAMAR KILGORE | ) | |
| [6] ELANCE JUSTIN LUCAS | ) | |
| [7] DECARLOS TITINGTON | ) | |

## MEMORANDUM OPINION

After a trial that began with jury selection on March 1, 2019, and ended on April 29, 2019, with the return of the verdicts following 6½ days of deliberation, the jury found Marcus Darden, Maurice Burks, Derrick Kilgore, Elance Lucas, and DeCarlos Titington guilty on the majority of counts contained in the Third Superseding Indictment (hereinafter "the Indictment"). (Doc. No. 831). The Indictment alleged crimes committed by Defendants[1] while members of the Gangster Disciples that – by virtue of the guilty verdicts on Count One – the jury found to be a criminal organization for purposes of the Racketeer Influence Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a).

Now before the Court are post-verdict Motions for Judgment of Acquittals filed by all Defendants. (Doc. Nos. 1387, 1388, 1392, 1404 & 1406). In addition, Lucas (Doc. No. 1406) and Burks (Doc. No. 1404) alternatively request a new trial. For the reasons that follow, the motions filed by Darden, Kilgore, Lucas, and Titington will be denied. The motion filed by Burks will be

---

[1] Defendants named in the Indictment included not only the five who went to trial, but also Brandon Hardison (whose trial has been severed because he faces the death penalty); Lamar Warfield (who remains a fugitive); and Lorenzo Brown, Xavier Jenkins, Rex Whitlock, and James Luke (who pled guilty before trial).

granted in part and denied in part.

Prior to delving into the merits of the pending motions, three comments regarding the structure of this opinion are in order. First, the Gangster Disciples have a lexicon of their own, and acronyms abound. Hence the need for numerous explanatory footnotes. Second, during the course of this case the Court has entered many substantive decisions, including three lengthy Memorandum Opinions and Omnibus Orders. Therefore, to avoid unduly lengthening what is necessarily a detailed opinion, the Court will not rehash that which has already been said, but will instead incorporate prior decisions by reference and expand upon them only where necessary to address the evidence introduced at trial. Third, a final transcript has not been ordered or prepared. Accordingly, the Court relies on its recollection of the evidence to the extent that recollection is supported by its own copious notes, the more than 1,200 exhibits that were admitted at trial, and the realtime transcripts that were prepared daily.

## I. Motions for Judgment of Acquittal by Darden, Kilgore, and Titington

Each of these three Defendants has filed a *pro forma* motion for judgment of acquittal. Darden "respectfully moves this Honorable Court to enter judgments of acquittal regarding Counts 1, 2, 15, 21 and 23 as they pertain to Defendant Darden," and simply argues that "the evidence presented by the government in this case is insufficient to sustain the convictions in the above Counts." (Doc. No. 1392 at 1). Likewise, Kilgore "respectfully moves this Honorable Court to enter judgments of acquittal regarding Counts 1, 2, 16, 17, 24-33 and Counts 43-45 as they pertain to Defendant Kilgore," and argues he "would state and show that the evidence presented by the government in this case is insufficient to sustain the convictions [on those Counts]." (Doc. No. 1387 at 1). Finally, Titington "respectfully moves this Honorable Court to enter judgments of acquittal

regarding Counts One, Two, Thirty-Four, Forty, Forty-One and Forty-Two, as the evidence presented by the government as to these six counts is insufficient for any rational trier of fact to have found each element of the offenses charged therein beyond a reasonable doubt." (Doc. No. 1388 at 1).

"In this circuit, it is well-settled that '[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 247 (6th Cir. 2007) (quoting McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997)). This applies to both civil and criminal cases, including motions for judgment of acquittal. See United States v. Kaufman, 92 F. App'x 253, 256 (6th Cir. 2004) (affirming denial of motion for judgment of acquittal and noting that "[t]his court repeatedly holds" underdeveloped argument are waived); United States v. Layne, 192 F.3d 556, 566 (6th Cir. 1999) (applying the rule set forth in McPherson to a sufficiency of the evidence challenge).

In the absence of any effort to present arguments based upon the evidence presented to the jury at trial, the Motion for Judgment of Acquittal filed by Darden (Doc. No. 1392), Kilgore (1387), and Titington (Doc. No. 1388) will be denied.

## II. Renewed Motion for Judgment of Acquittal and Motions

Both Lucas and Burks raise a number of substantive challenges in seeking a judgment of acquittal or a new trial. To place those arguments in perspective, it is necessary to first delineate the standards of review.

3

## A. Motions for Judgment of Acquittal – Rule 29

Motions for judgment of acquittal after the close of the government's case, after the close of the evidence, and after the return of a verdict are all governed by Rule 29 of the Federal Rules of Criminal Procedure. In determining whether such a motion should be granted, "[t]he relevant inquiry is whether, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Fisher, 648 F.3d 442, 450 (6th Cir. 2011) (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

"Under the Jackson v. Virginia standard, a reviewing court does 'not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.'" Id. (citation omitted). "'Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt.'" Id. (quoting United States v. Lee, 359 F.3d 412, 418 (6th Cir. 2004)). Given this, a defendant moving for a judgment of acquittal under Rule 29 bears a "very heavy burden." United States v. Ostrander, 411 F.3d 684, 691 (6th Cir. 2005) (citing United States v. Walls, 293 F.3d 959, 967 (6th Cir. 2002); United States v. Tocco, 200 F.3d 401, 424 (6th Cir. 2000)).

## B. Motions for New Trial – Rule 33

"A motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure may be premised upon the argument that the jury's verdict was against the manifest weight of the evidence." United States v. Hughes, 505 F.3d 578, 592 (6th Cir. 2007). "Generally, such motions are granted only . . . 'where the evidence preponderates heavily against the verdict.'" Id. at 592-93.

"In deciding Rule 33 motions based on the manifest weight of the evidence, . . . a district

4

judge 'may sit as a thirteenth juror' and consider the evidence to ensure that there is no miscarriage of justice.'" United States v. Monoz, 605 F.3d 359, 373 n.9 (6th Cir. 2010) (citation omitted). In this regard, the trial judge may assess the credibility of witnesses and the weight of the evidence. United States v. Reeves, 636 F. App'x 350, 353 (6th Cir. 2016) United States v. Lutz, 154 F.3d 581, 589 (6th Cir. 1998). Still, and while "[t]he decision of whether to grant a new trial is committed to the 'sound discretion of the trial judge, . . . this discretion should be exercised 'only in extraordinary circumstance[s].'" United States v. Canal Barge Co., 631 F.3d 347, 357 (6th Cir. 2011) (citation omitted).

### III. Lucas's Motion for Judgment of Acquittal or for a New Trial

With two limited exceptions, Lucas's combined motion/brief for acquittal or a new trial does not specifically identify which argument is directed at which motion. Consequently, the Court will discuss the arguments in the order presented.

**A. Fatal Variances**

Lucas argues there was a fatal variance in the conspiracy counts. Count One of the Indictment charged a RICO conspiracy that began in or around 2005 and continued until the return of that Indictment on November 7, 2018. Count Two charged a drug distribution conspiracy during the same time frame.

A fatal variance "'occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" United States v. Kuehne, 547 F.3d 667, 683 (6th Cir. 2008) (quoting United States v. Prince, 214 F.3d 740, 757 (6th Cir. 2000)).[2] To establish a fatal variance, defendant must "prove that (1) a variance

---

[2] In some cases, a fatal variance has been equated with a constructive amendment. See Lucas v. O'Dea, 179 F.3d 412, 416 (6th Cir. 1999) (stating that a "fatal variance" is "also known as a 'constructive

occurred and (2) that the variance affected a substantial right of the defendant." Id.

Reviewing a claim of fatal variance, therefore, is a two-fold inquiry: "was there a variance, and if so, was it prejudicial[?]" United States v. Mize, 814 F.3d 401, 410 (6th Cir. 2016) (citing Kuehne, 547 F.3d at 683). As to the former, a court "look[s] to whether the evidence can 'reasonably be construed only as supporting a finding of multiple conspiracies' rather than the single conspiracy alleged in the indictment.'" Id. (quoting United States v. Warner, 690 F.2d 545, 548 (6th Cir. 1982)). As to the latter, a court considers whether defendant has "show[n] that the variance prejudiced either his ability to defend himself or the overall fairness of his trial." Id. (citing United States v. Manning, 142 F.3d 336, 339 (6th Cir. 1998). "Prejudice exists 'where the defendant is unable to present his case and is taken by surprise by the evidence offered at trial'; 'where the defendant is convicted for substantive offenses committed by another'; or 'where spillover [occurs] because of a large number of improperly joined defendants.'" Id. (quoting United States v. Swafford, 512 F.3d 833, 842–43 (6th Cir. 2008)).

### 1. Variance as to Count One

Lucas argues that, in the RICO conspiracy count, the Government "alleged the Gangster Disciples was a singular violent national criminal gang that employed a structured, hierarchical organization organized nationally, by state and by region," and "maintained that the Middle

---

amendment'"). However, differences have been drawn between the two concepts, even though the distinctions may be "at best shadowy." United States v. Barrow, 118 F.3d 482, 488 (6th Cir. 1997). Both relate to modifications of the indictment, but the Sixth Circuit has explained that "[c]onstructive amendments and variances . . . differ with respect to the burden placed upon the defendant and the remedy mandated upon a showing that a constructive amendment or variance has occurred." Kuehne, 547 F.3d at 68. In contrast to a fatal variance (as discussed above), a constructive amendment is "per se prejudicial because it infringes upon the Fifth Amendment's grand jury guarantee," and "'results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which modify essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment.'" Id. (citation omitted).

Tennessee region was known as the '615 region' and this region was subdivided into various cities, towns, or other areas within a specific 'region' called 'lands' and 'decks.'"[3] (Doc. No. 1406 at 1-2). This was different from the evidence at trial, he submits, because the proof "revealed separate periods in which various decks were not considered part of the national gang much less the '615' region." (Id. at 2). As support, Lucas points to (1) Danyon Dowlen's testimony that, in 2010, the Clarksville deck did not have meetings or collect dues; (2) Trey Galbreath's testimony that "the Clarksville deck did not affiliate with the other decks in the area while he was 'in rotation'"[4] nor did he "take orders from any national organization"; and (3) Johnny Austin's testimony[5] that the Murfreesboro deck "was on hold in 2014," and that each deck had different rules. (Id.). From Lucas's perspective, this evidence shows "there was not one overall conspiracy but rather several independent groups calling themselves Gangster Disciples doing their own thing." (Id.).

Lucas's arguments fail for any of a number of reasons. To begin with, much as he argued at trial, Lucas incorrectly asserts that the Government was required to prove that the Gangster Disciples was a national organization of which he was a member. To be sure, the Indictment alleges that the Gangster Disciples is organized "nationally," that since its inception in the 1970s it "recruited members throughout the United States," and that by the mid-1980's the group had spread throughout the midwestern and eastern areas of the United States," with members "active in numerous states throughout the United States as of the date of the Indictment." (Doc. No. 831,

---

[3] "Lands" or "decks" are a collection of members in a particular area, usually a city. They can be roughly equated with chapters in other organizations.

[4] "In rotation" means that a member is active and in good standing with the Gangster Disciples.

[5] As the Government points out in its response, it was actually Carlos Jordan who testified that the Murfreesboro deck was "on hold" (inactive) in 2014, (Rough Trans. 3/18/2019 at 57), with the inference being that it was active at other times.

Indictment ¶¶ 2 a., d.).  However, as it pertains to Lucas and the other Defendants, the Indictment also alleged that the Gangster Disciples was organized "by state" and "by region"; a "region was usually identified by area code"; Middle Tennessee was identified as the 615 region with "lands" and "decks"; and, most pertinently, that the racketeering activity occurred in "the Middle District of Tennessee and elsewhere."  (Id. ¶¶ 1, 2d.).

"[P]roof of every allegation is not required in order to convict[.]"  United States v. Stull, 743 F.2d 439, 442 n.2 (6th Cir. 1984).  Rather, the "[e]lements of a crime must be charged in an indictment and proved to a jury beyond a reasonable doubt."  United States v. O'Brien, 560 U.S. 218, 224 (2010) (citing Hamling v. United States, 418 U.S. 87, 117 (1974); see also, United States v. Valencia, 600 F.3d 389, 432 (5th Cir. 2010) (holding that the government must prove facts alleged in the indictment that meet the essential elements of the charged crime, and any additional facts alleged that go beyond the essential elements are treated as mere surplusage);  United States v. Eliassi, 46 F.3d 1127 (4th Cir. 1995) ("Clearly the government need not prove every factual allegation in an indictment as long as it proves beyond a reasonable doubt each element of the offense charged").[6]  Moreover, a fatal variance occurs only when "the evidence at trial proves facts

---

[6]  Without objection from Lucas, the jury was instructed on the following elements of a RICO conspiracy:

First: A conspiracy or agreement, as detailed in the indictment, existed between two or more persons to participate in the affairs of an enterprise that affected interstate commerce through a pattern of racketeering activity;

Second: Defendant deliberately joined or became a member of the conspiracy or agreement with knowledge of its purpose, and;

Third: In knowingly joining the agreement or conspiracy, Defendant (a) intended to conduct or to participate, directly or indirectly, in the enterprise's affairs through a pattern of racketeering activity; or (b) agreed that at least one other member of the conspiracy would commit at least two acts of racketeering.

materially different from those alleged in the indictment." United States v. Rios, 830 F.3d 403, 427 (6th Cir. 2016).

For purpose of his Motion for Judgment of Acquittal, any reasonable jury could have found Lucas guilty of knowingly joining a criminal organization known as the Gangster Disciples and agreeing to participate in its pattern of racketeering, and, for purposes of his Motion for a New Trial, it would not be a manifest injustice for the jury to so conclude. This is true whether the Gangster Disciples is viewed as a national organization, or as a regional organization because the Government proved the existence of both, and the evidence at trial fully supported the allegations contained in Count One.

First, on a national scale, the proof presented at trial established that the Gangster Disciples was formed in the late 1960s after the merger of Larry Hoover's and David Barksdale's Chicago street gangs. Hoover continues at the helm as Chairman, continues to communicate with gang members, and receives payments from some gang members, notwithstanding his incarceration at ADX-Florence, Colorado, the federal supermax prison. The evidence also showed that the Gangster Disciples are governed by a national board of directors,[7] portions of dues collected at the local level are supposed to be sent to officials and from there to the national organization (after all, according to Dowlen, its "Larry's money" and subject to audit), and annual meetings/Larry Hoover birthday celebrations are held at various locations around the country.[8] The evidence further indicated that

(Doc. 1397 at 31).

[7] Several board members were identified during a conference call that was intercepted by the Federal Bureau of Investigation in relation to an investigation originating in Atlanta, Georgia.

[8] At one such state meeting held in Memphis, Tennessee in November 2014, Austin was recognized as being the "Most Improved Gangsta." (Rough Trans. 3/18/2019 at 144) He was chagrined to find out, however, that the award would not be accompanied by a plaque as in prior years.

9

members commonly wear blue and black to show their membership, and use recognized and well-understood signs, such as a six-pointed star (✡) that resembles the Star of David,[9] a three-tined "pitchfork" (bearing a resemblance to a trident or the Greek letter psi $(\psi)$, but with pointed tips when hand-drawn), and the number "74" representing the seventh ("G") and fourth ("D") letters of the alphabet. Oftentimes, members have these signs and others tattooed on their bodies as a source of pride, and to confirm their allegiance to the Gangster Disciples.

The evidence also showed, from a big picture perspective, that male members were referred to collectively as "Brothers of the Struggle" or "BOSS,"[10] and female members were referred to as "Sisters of the Struggle." It further showed members (1) were often recruited from jails, prisons,[11] or local neighborhoods; (2) used nicknames proceeded by "Mac" (an acronym for either "Making a Change" or "Manipulating all Change"); (3) "flashed" or "threw up" certain gang signs (such as closing one's ring and pinky fingers to the palm while displaying the thumb, middle, and index finger as an approximation of a pitchfork); and (4) shared literature that set forth the gang's beliefs, such as (a) the "17 Laws" that required silence and secrecy, exercise, and mutual assistance and aid, but prohibited stealing, rape, and the use of drugs, among other things; (b) a revised "17 Laws" for incarcerated members; (c) the "I Pledge"; and (d) the "We Pledge."

Much of the foregoing translated down to the local level and, in particular Clarksville, which

---

[9] The points of the star, starting from the top and working clockwise, are said to be "Love," "Life," "Loyalty," "Knowledge," "Wisdom," and "Understanding."

[10] When a member truly intends to take an action, he can swear to do so by "putting it on the BOSS," much like one might swear to the Almighty.

[11] Even while imprisoned, some members had Positions of Authority ("POA"), i.e. held a rank, such as Block or Pod Coordinator.

10

was the locus of the charges in this case. The evidence showed, for example, that the southern district of the Gangster Disciples includes the states of Tennessee, Alabama, Georgia, North Carolina, South Carolina, Florida, and Kentucky, and that Tennessee was divided into three regions West (Memphis), East (Chattanooga) and Middle (Clarksville). For many years, Byron Purdy was the Gangster Disciples Governor of Tennessee and the decks in the state reported to him.

Even more locally, the 615 region had decks in various cities, including, but not limited to, Clarksville, Nashville, Gallatin, Murfreesboro, and Lebanon.[12] For much of the time covered by the Indictment, Darden was the Regent, Head of Security, or Enforcer. In those roles, Darden addressed issues that came up in the Region, including ones arising in Columbia, Springfield, and Nashville. When Darden was Regent, all local members reported to him, and he, in turn, reported to the state governor. As Regent, Darden was also responsible for handing out positions of authority. Positions of authority included such things as Secretary, Treasurer, Chief Enforcer, Chief of Security, and Coordinator. Among others holding positions of authority at various times in the Clarksville deck were Burks, who served at times as an Enforcer and Regent; Whitlock, who served as a Secretary and Area Coordinator; Jenkins, who served as the Literature Coordinator; Titington, who served as a Block Coordinator and/or Enforcer at Lincoln Homes;[13] and Kilgore, who was on the security team.

"Mac" was the common preface to member's nicknames, with Darden known as "Mac T" or "Mac Tuff"; Burks as "Mac Reese" or Mac Reesy"; Kilgore as "Mac Smut"; and Lucas as "Mac

---

[12] These decks varied greatly in size, with Clarksville being the largest, both in terms of the number of members in rotation and the size of its "box," meaning the amount of money collected from dues.

[13] Lincoln Homes is a public housing complex in Clarksville. Gangster Disciples commonly refer to public housing as "bricks" or "slabs."

Luke." Further, numerous pictures were introduced showing Defendants wearing blue and black, flashing gang signs, or standing with arms and legs crossed in such a manner so as to resemble the 6-pointed star. Photographs of tattoos showing Defendants' loyalty to the Gangster Disciples were presented to the jury as well. These included tattoos of a six-pointed star (Darden, Lucas and Hardison); and references to being a gangster (Burks – "Gangsta Whenever"; Whitlock – "Only God Forgives, Gangsters Don't"). And, as if to underscore 615's affiliation with the national Gangster Disciples, Whitlock has a tattoo on the top of his chest stating "One of Larrys [sic] Guys," and a picture of Larry Hoover on his leg, while Lucas was photographed wearing a "Free Larry Hoover" t-shirt.

Paper records seized during searches were also introduced that showed the attendance of most of the Defendants at monthly meetings (also known as "deuces"[14]) and the payment of dues, along with phone lists identifying members by their "Mac" monikers. Those searches also revealed a connection between Clarksville and the national organization with the discovery of copies of the "17 Laws"; the "We Pledge" wherein members pledge loyalty to the "Chairman" and to adhere to the teaching and policies of the "Chairman and Executive Staff" (Doc. No. 527); and the "I Pledge," wherein members "agree to serve this glorious organization in its every cause; and aid and assist my fellow brothers of the struggle in all righteous endeavors" (Doc. No. 295).

The jury also saw Facebook and Instagram postings that were maintained by Clarksville Gangster Disciple members, which tended to show affiliation with each other and support for the Gangster Disciples generally. Further, there was testimonial evidence that, in keeping with the "17

---

[14] At times, such as after a shooting, it was necessary to call "emergency deuces."

laws," Clarksville members were required to respond to another member who needed assistance.[15] Failure to abide by those laws could result in "violations," a "Gangster Disciples arrest,"[16] and subsequent punishment.

Additionally, there was testimonial evidence from which the jury could conclude that stature in the Gangster Disciples could be increased by assaulting, shooting, or killing rival gang members. This was not mere fanciful thinking, as the jury was presented with plenty of evidence of violent acts committed by members. Just by way of examples, the jury heard testimony – and sometimes saw pictures of the carnage – about Gangster Disciples named in the Indictment being responsible for:

(1) a drive-by shooting of several individuals at a gathering in front of the house at 384 Treeland Drive because it was thought some members of the Vice Lords (a rival gang) might be in attendance. The shooting resulted in the airlifting of at least one victim to the hospital and a lengthy police pursuit;

(2) shooting Crystal Allen in the rear-end on September 13, 2009 because she had the misfortune of being on Oak Street, which is in Vice Lord territory;

(3) shooting William Miller a/k/a Lil Will, a member of the Vice Lords, because he disrespected the Gangster Disciples by throwing *down* the pitchforks;

(4) the murder of Jesse Hairston in September of 2007, in retaliation for the murder of Hockett a/k/a Mac Chicken;

(5) the murder of Malcolm Wright on November 3, 2012, at C-Ray's in retaliation for Hardison having been assaulted by a member of the Vice Lords; and

(6) the murder of Derrick Sherden, who allegedly owed Hardison a small drug debt, and Amanda Weyland, an innocent bystander.

The Court could go on *ad nauseam*, but the foregoing is more than enough to show a

---

[15] This could result in a call for "all hands on deck," whereby all available members were required to respond and provide assistance.

[16] A "Gangster Disciples arrest" was effectively a kidnaping whereby the member was forcibly taken into custody by other members and held (possibly overnight) for "trial."

reasonable jury could conclude that Defendants were not, as Burks' counsel argued during opening, simply a "loose bunch of knuckleheads" from the small town of Guthrie, Kentucky who hung out together because they were friends,[17] or just some freelancing guys co-opting the Gangster Disciples' name while doing their "own thing," as Lucas now argues.

It is true that some witnesses (most notably Wallace "Gator" Williams) testified the Gangster Disciples' message is now positive. Such testimony suggested that, sometime in the mid-1990s, the Gangster Disciples changed from the "360 concept" (where one was "jumped in" or beaten in order to join the gang[18]) to the "720 concept" or "Growth and Development" model in the mid-1990's (where members were "blessed" into the gang after learning its history and being able to recite its literature). Nevertheless, a reasonable jury, based upon the strength of the evidence, could have easily concluded that, for many gang members and the organization as a whole, this was merely an intentional change in semantics meant to mask the Gangster Disciples' continuing criminal activity. The jury could also easily conclude that the virtuous aspect of the 17 laws were honored more in the breach than in their observance.

It is also true, as Lucas puts it, that there was no evidence showing that he "committ[ed] a single act of violence," and the evidence as to his participation in the Gangster Disciples was less

---

[17] Gangster Disciple members that hailed from Guthrie sometimes referred to as "New Jack City" after the movie of the same name involving drug dealers in the "Cash Money Brothers" gang.

[18] Beatings were not limited to initiates. A member can be beaten or "smashed" for running afoul of the rules. This could be with or without "cover-up," meaning that the person being beaten by three to six other members either could, or could not, use his hand and arms to protect his body, face and head to protect it from blows. Beatings could last anywhere from 30 seconds to 6 minutes, with the latter generally reserved for those being drummed out of the gang, or "smashed off." So much for PML, or "Plenty Much Love."

Nor were the beatings limited to members. Rivals were also subject to "smashing," such as the order following Sylvester Hockett's murder that Bloods be "smashed on sight." Smashing on sight was also expected when rival gang members invaded Gangster Disciples' territory.

than that presented against some of the other Defendants. (Doc. No. 1406 at 3). But "'[w]hether he was a big fish or a little fish is not of great consequence in a conspiracy unless the person didn't fully participate.'" United States v. Caper, 571 F. App'x 456, 461 (6th Cir. 2014) (citation omitted); see also United States v. Mezzanatto, 513 U.S. 196, 206 (1995) (recognizing that there are "big fish" and "small fish" in conspiracies); United States v. Menting, 166 F.3d 923, 929 (7th Cir. 1999) (stating that "the fact that [defendant] played a lesser role than other participants does not relieve him from liability: a conspiracy may include both big fish and small fry"); Pringle v. Garcia, No. 2:09-CV-022-PPS-PRC, 2014 WL 1651976, at *5–6 (N.D. Ind. Apr. 23, 2014) (noting that a RICO "conspiracy claim applies to little fish as well as big fish")

Carrying the big fish/small fish analogy a step further, it has be observed that "[w]hen the Government throws out its big conspiracy net to catch the big fish in the criminal sea, . . . an occasional minnow may wriggle free." United States v. Tramunti, 513 F.2d 1087, 1112 (2d Cir. 1975). Here, however, it was entirely reasonable for the jury to conclude that Lucas was not the minnow he now claims to be based upon the following evidence:

(1) Lucas was a long-standing member of the Gangster Disciples;

(2) Lucas committed racketeering acts furthering the RICO conspiracy by selling more than 26 grams of crack cocaine. Those sales occurred on March 10, 2015, March 27, 2015, and May 13, 2015;

(3) Lucas, along with Darden and Burks, provided Dowlen with funds while Dowlen was on the run in Alabama;

(4) Lucas maintained a stash of guns at the "cave"[19] in Guthrie that included assault rifles and handguns; and

(5) Lucas provided Gangster Disciples members with several assault rifles that were

---

[19] According to Dowlen, the "cave" was a safehouse used by Gangster Disciples to hide fugitives, weapons, and narcotics.

> to be used to shoot Bloods gang members at the Plush nightclub in Clarksville in the
> fall of 2012, but the attack was aborted.

In short, the evidence was more than sufficient for the jury to find that Lucas was a member of the Gangster Disciples, and that the enterprise engaged in racketeering activities of which Lucas was a willing participant. Bringing the fish analogy full circle, Lucas was a "keeper." Accordingly, he is not entitled to either a judgment of acquittal or new trial based upon an alleged variance in Count One.

### 2. *Variance as to Count Two*

Count Two of the Indictment alleges that, from 2005 until November 2018, Defendants conspired to distribute and possess with intent to distribute five kilograms or more of cocaine hydrochloride, 280 grams or more of cocaine base, oxycodone, methadone, hydrocodone, and marijuana. Lucas briefly argues there was a fatal variance between those allegations and the evidence adduced at trial because "the government charged a single drug conspiracy," but "introduced evidence of codefendant Burks' drug conspiracy with another individual who was a member of a rival gang." (Doc. No. 1406 at 2).

"When the government prosecutes more than one conspiracy under a single indictment and at a single trial, the resultant variance is error." United States v. Warman, 578 F.3d 320, 341 (6th Cir. 2009). However, "[t]his error requires reversal only if it prejudices the defendant by transferring 'guilt to an individual defendant involved in one conspiracy from evidence incriminating defendants in a conspiracy in which the particular defendant was not involved.'" (Id.) (quoting United States v. Levine, 569 F.2d 1175, 1177 (1st Cir. 1978)). Moreover, "'[w]hether single or multiple conspiracies have been established is usually a question of fact to be resolved by the jury,'" and "typically any danger of prejudice can be cured with a cautionary instruction to the

16

jury that if it finds multiple conspiracies, it cannot use evidence relating to one conspiracy in determining another conspiracy." Id. at 342 (quoting United States v. Smith, 320 F.3d 647, 652 (6th Cir. 2003)). Finally, "'[w]here the evidence demonstrates *only* multiple conspiracies, a defendant is prejudiced if the error of trying multiple conspiracies under a single indictment substantially influenced the outcome of the trial." United States v. Swafford, 512 F.3d 833, 842 (6th Cir. 2008) (emphasis in original) (quoting United States v. Caver, 470 F.3d 220, 235–37 (6th Cir. 2006)).

The Court does not recall any evidence definitively establishing that Macksey McKnight was a member of a rival gang, or that a conspiracy between McKnight and Burks was alleged in the Western District of Kentucky case.[20] Regardless, "the same set of facts [can] support both a finding of a single conspiracy and a finding of multiple conspiracies." United States v. Quinones-Cedeno, 51 F. App'x 558, 565 (6th Cir. 2002) (citing United States v. Davenport, 808 F.2d 1212, 1217 (6th Cir. 1987)); see also, United States v. Tedder, 801 F.2d 1437, 1447 (4th Cir. 1986) (observing that "innumerable inferences can be drawn from the same set of facts" and "[t]hus, the government's use of the same evidence to prove each of the special elements required for the three different conspiracies is unexceptionable"); United States v. McKenzie, No. CRIM. 11-009-JJB, 2011 WL 5320690, at *4 (M.D. La. Nov. 2, 2011) ("[T]here is a crucial difference between merely using the same evidence to show different conspiracies and that evidence actually showing only a single conspiracy. Just as a single conversation might touch on multiple topics, so too might a single piece of evidence show multiple agreements and, hence, multiple conspiracies.").

Contrary to Lucas's argument, the evidence in this case did not show *only* multiple

---

[20] An eight-count Indictment was returned in the Kentucky case. In Count 1 through 6, Burks was charged with distributing cocaine, and crack cocaine; in Count 7, McKnight was charged with distributing crack cocaine; and, in Count 8, Burks and McKnight were charged with aiding and abetting each other in distributing cocaine on March 11, 2011. (Doc. No. 696-1).

17

conspiracies, nor can it be said that Lucas was convicted of conspiracy by virtue of Burks being named in the Kentucky case. As already noted, the jury was presented with more than sufficient evidence of Lucas' own involvement in the Gangster Disciples, and his own drug dealing as a member of that organization. Furthermore, in keeping with Sixth Circuit Pattern Instruction 3.08, the jury was instructed:

> To convict any one of the defendants of the drug conspiracy charge, the government must convince you beyond a reasonable doubt that a defendant was a member of the drug conspiracy charged in the indictment. . . . Some of the defendants have argued that there were really multiple conspiracies. Proof that a defendant was a member of some other conspiracy is not enough to convict. But proof that a defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict, if the government also proved that he was a member of either conspiracy charged in the indictment.

(Doc. No. 1397 at 58-59).

Accordingly, Lucas is not entitled to acquittal or a new trial based upon the difference between that which was alleged in Count Two of the Indictment and the proof that was introduced at trial.

## B. Sufficiency of the Evidence

Under the heading "Sufficiency of Evidence," Lucas argues that "no rational fact finder could conclude that the racketeering activity of the RICO enterprise was narcotics trafficking." (Doc. No. 1406 at 3). This is because: (1) "Dowlen stated the gang did not control who you sold to, who you bought from, [or] who to give a discount to"; (2) "Austin testified there was no folk price";[21] (3) Carlos "Jordan testified no drug profits were split with the gang"; (4) Tray "Galbreath testified you could sell to whoever you wanted to"; and (5) Dezorick "Ford perhaps said it best,

---

[21] The Gangster Disciples are said to be a part of the "Folk Nation," which is an affiliation of like-minded gangs.

'money is green.'" (Id. at 3-4).

Even if the jury was persuaded by this testimony – hand-selected from 5 of the 83 witnesses who testified during the Government's case in chief – it does not follow that there was a variance because the evidence also showed that there were other benefits to Gangster Disciple members who sold drugs. They were all but assured that they could deal drugs in certain areas without competition or fear, including Lincoln Homes, Greenwood Homes (specifically Maddox Circle and Lennox Court) parts of Main Street, and portions of Guthrie that straddled the Tennessee/Kentucky line. Outside of such neighborhoods, and assuming it was not rival territory (such as Summit Height, which was Vice Lords's turf, or the Birchwood neighborhood, which was a Bloods' stronghold), Gangster Disciples members had little fear of being assaulted or robbed because it was commonly understood that gang members could call on their comrades to come to their aid and exact retribution. Further, members could call on each other for protection when moving or packaging drugs, and they had access to a network of other Gangster Disciple members in other cities when they needed to secure drugs. In short, membership had its privileges, even if that membership did not extend to getting a "folk price."

## C. New Trial in the Interest of Justice

Finally, under the heading "Motion for New Trial," Lucas selects four incidents that arose during course of the six week trial and claims those entitle him to a new trial. The entirety of his argument is as follows:

> Interest of justice requires a new trial for Mr. Lucas. Mr. Lucas twice moved for a mistrial. First, when the jurors reported being scared when leaving the courthouse and wrongly imagining their photographs being taken by gang members. Second, when the government elicited from witness Austin that he was afraid he would be killed because of his testimony. This coupled with the seating arrangement of the defendants and witness Daniels walking off from the witness stand left the jurors

19

with the impression that these defendants were bad, bad, men. This was most unfair to Mr. Lucas who did not have a single piece of evidence brought against him that he committed a violent act.

(Doc. No. at 1406 at 4).

Just as with the other Defendants' perfunctory Rule 29 motions, these arguments are subject to summary denial because, as already noted, the Court is not required to put meat on the bones of an argument. However, because Burks also raises these same matters in his motion, the Court considers them now.

Over the course of the trial, the jury sent several notes to the Court. Approximately two weeks in, the Court received a note dated March 19, 2019, stating that several jurors had expressed concerns that people were walking in and out of the courtroom; cell phones were being used by an audience member to take photographs of jurors; a couple of women had walked onto the back loading dock where jurors entered and exited the building; and jurors may have been followed to their designated parking area that was a couple of blocks from the courthouse.

The Court read the note in its entirety in open court, and solicited comments from the lawyers. The consensus, with which the Court agreed, was that a conservative approach should be taken so as not to highlight any security concerns. Accordingly, before the jury was summoned back into the courtroom, the Court told the public sitting in the gallery that, while this was the "people's court" and they certainly had a right to be there, entrances and exits from the courtroom were very distracting to the jury, the lawyers, the Defendants, and the Court. Accordingly, the audience members were asked to limit their ingress and egress, and to sit in the back pews if they thought they would need to leave before the next break. Thereafter, the jury was brought into the courtroom and told that (1) the court had received and carefully read their note; (2) there were no cell phones in the

20

courtroom, as they were prohibited by local rule; (3) the public had the right to observe the proceedings, but had been asked to limit the amount of times they came in and out of the courtroom; and (4) the court staff had been made aware of the contents of the note and would serve as the Court's eyes and ears going forward.

Whether to grant a mistrial is a matter of sound discretion for the court, United States v. Wandahsega, 924 F.3d 868, 878 (6th Cir. 2019), and should be granted without all defendant's request only when "manifest necessity exists," United States v. Williamson, 656 F. App'x 175, 181 (6th Cir. 2016), so as balance a defendant's "valued right to have his trial completed by a particular tribunal," with "the public's interest in fair trials designed to end in just judgements," Arizona v. Washington, 434 U.S. 497, 503, 516 (1978). Manifest necessity "is not to be interpreted literally or applied mechanically; what is required is a 'high degree' of necessity." Ross v. Petro, 515 F.3d 653, 660-61 (6th Cir. 2008) (quoting Washington, 434 U.S. at 406); see also, Harpster v. Ohio, 128 F.3d 322, 328 (6th Cir. 1997) ("The manifest necessity inquiry is a flexible one, with reviewing courts analyzing the trial court's exercise of discretion in light of the particular facts and circumstances of each individual case.").

The situation surrounding the jury note did not suggest any need for a mistrial, let alone manifest necessity. No party voiced any objection to the Court's instructions,[22] and the Court believes this was the best way to handle the matter given the circumstances. At no time did the jury express fear of any of the Defendants on trial; to the contrary they specifically stated in their note that they had not arrived at a decision and were trying to conscientiously perform their duties as

---

[22] During the discussion before the jury returned into the courtroom, Lucas orally moved for a mistrial which was denied because the jury note did not suggest "manifest necessity," and it was not "even close to a mistrial at this point." (Rough Trans. 3/19/2019 at 144).

jurors.  Further, audience members limited their entrance and egress as requested, and the jury expressed no further concerns of a similar kind during the remaining four weeks of trial.

Nor did the incident involving Austin warrant a mistrial then,[23] or a new trial now.  Called as a Government witness, Austin was visibly nervous when he took the stand.   Early into his testimony, the Government remarked that Austin did not appear to "want to be here," to which he responded, "just nervous."  Several lines of questioning followed during which Austin continued to exhibit signs that he was uncomfortable.  This prompted the following colloquy:

> Q. All right. And we'll talk about Vossie in just a minute, Mr. Austin. I want to ask you about a series of meetings that happened over the course of 2014 in Nashville and around the 615 region. Are you all right, Mr. Austin?
>
> A. Nervous.
>
> Q. Why are you nervous?
>
> A. Because I'm testifying. I'm scared -- I'm scared for my life.
>
> Q. Are there consequences for somebody who testifies?
>
> A. Yes, sir.
>
> Q. What kind of consequences could those be?
>
> A. Eradication.
>
> Q. What's eradication?
>
> A. They going to kill me.
>
> Q. You mean the members of the Gangster Disciples might?
>
> A. Yes, sir.

_____

[23] This incident led Burks to file a Motion for Mistrial or, Alternatively, a Jury Instruction in which he characterized the Government's questioning as "deliberate," "calculated," and "reprehensible." (Doc. No. 1289 at 2, 3).  The motion was summarily denied.

(Rough Trans. March 26, 2019 at 62). Austin was visibly nervous when he took the stand, and the question "are you all right, Mr. Austin?" was obviously in response to that nervousness.

In the absence of Lucas setting forth the legal basis for his argument, the Court presumes, as does the Government, that Lucas's objection is that the probative value of Austin's response was substantially outweighed by the danger of its unfair prejudice because it suggested Defendants were "bad, bad men." To the extent that is the basis for the objection, it fails.

Under Rule 401, "evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Rule 402, in turn, provides that relevant evidence is generally admissible, unless otherwise excluded by the rules, a statute, or the Constitution. This includes Rule 403 which provides that "[t]he court exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Rule 403 requires the balancing of "decisional scales," United States v. Stout, 509 F.3d 796, 808 (6th Cir. 2007), but "it is important to note that only 'unfair' prejudice is to be avoided, as 'by design, all evidence is meant to be prejudicial,'" United States v. Morales-Aldahondo, 524 F.3d 115, 119–20 (1st Cir. 2008) (citation omitted); see also, United States v. Gold Unlimited, Inc., 177 F.3d 472, 487 n. 9 (6th Cir. 1999) ("Rule 403 directs the district court to balance probativeness not against prejudice, but against unfair prejudice."). The trial court exercises "very broad discretion" in determining how best to strike that balance. United States v. Fisher, 648 F.3d 442, 449 (6th Cir. 2011); United States v. Vance, 871 F.2d 572, 576 (6th Cir. 1989).

23

Unquestionably, concerns arise when a witness testifies that he fears for his safety because such expressions could allow the jury to reach a verdict on impermissible grounds. United States v. McKinney, 954 F.2d 471, 479 (7th Cir. 1992); United States v Qamar, 671 F.2d 732, 736 (2nd Cir. 1982). This does not mean however, that fear of repercussions is always out of bounds. Indeed, evidence of threats to witnesses is admissible, so long as the Government "'ha[s] an important purpose for the evidence in order to satisfy the Rule 403 balancing test.'" United States v. Lacey, 1995 WL 258142 at *9 (6th Cir. May 2, 1995) (quoting Qamar, 671 F.2d at 736). "That is certainly true when threats are 'inextricably intertwined with the evidence regarding the charged offense.'" United States v. Morgan, 786 F.3d 227, 232 (2nd Cir. 2015) (quoting United States v. Quinones, 511 F.3d 289, 309 (2nd Cir. 2007)).

Here, the RICO count, on numerous occasions, specifically alleges that Gangster Disciples sought to prevent and punish cooperation with law enforcement, and this was a part of the racketeering activity. For example, Section 1 alleges the Gangster Disciples was "a criminal organization whose members and associates engaged in . . . acts of violence involving murder, assault, and the intimidation of witnesses"; Section 4 alleges that members sought to "[p]reserv[e] and protect[] the . . . enterprise through the use of threats, intimidation, violence, and destruction, including but not limited to, acts involving murder, assault, [and] intimidation of witnesses and victims"; and Section 5 alleges that one of the "means and methods" used by the organization to protect the enterprise was by "commit[ting] and conspir[ing] to commit acts involving murder, intimidation, and assault against individuals who posed a threat to the enterprise . . . and witnesses to illegal activities of the enterprise." (Doc. No. 831 at 3, 7, 8). As would be expected from these allegations, the Government elicited testimony about intimidation and threats, and this occurred both

24

before and after Austin testified. In fact, Austin himself later testified that, while in custody, he had been beaten by Gangster Disciples (none of the Defendants) for talking to prosecutors and told that he "was snitching" and they would "get [him] again." (Rough Trans. 3/18/2018 at 177). The long and the short of it is that the questions put to Austin was not unfairly prejudicial to Defendants given the allegations in the Indictment, particularly because none of the Defendants was ever suggested to be the ones who allegedly made the threats.

Insofar as Lucas's mistrial or new trial claim is based on the testimony of Ronnie Daniels, that requires little discussion. When called as a witness by the Government, Daniels refused to answer. He was then instructed by the Court to answer the question, but again refused to answer prompting the Court to hold him in contempt outside the presence of the jury. After several days in jail, Daniels professed to have a change in heart, resumed the witness stand, and proceeded to claim not to remember almost anything. This lead to the Government questioning whether he had or had not answered certain question when called before the grand jury. For the most part, Daniels again feigned not to remember. None of this required a mistrial, nor is Lucas entitled to a new trial based upon Daniels' recalcitrance as a witness. See, United States v. Austin, 81 F.3d 161 (6th Cir. 1996) (stating that whether to allow grand jury testimony of a recalcitrant witness at trial is a matter of discretion and that failure to recollect is considered an inconsistency for purposes of Rule 801(d)(1)(A)).

Lucas's complaint about the "seating arrangement" is presumably a reference to how defense counsel and their clients were seated at trial due to the number of defense lawyers (8); Defendants (5); and the configuration of the courtroom. In the absence of any further argument, the Court stands by its written Order (Doc. No. 1220) that set forth in detail the reasons why Defendants were seated

behind their counsel.

The foregoing incidents identified by Lucas, even taken collectively do not warrant a new trial. None of these events suggest that a miscarriage of justice occurred when the jury found Lucas guilty of RICO conspiracy, as alleged in Count One, and drug distribution conspiracy, as alleged in Count Two.

### III. Burks's Motion for Judgment of Acquittal or for a New Trial

Burks' Motion for Judgment of Acquittal or a New Trial spans 44 pages, the Government's response (Doc. No. 1443) runs 76 pages, and Burks' reply (Doc. No. 1457) adds an additional 30 pages to the briefing. Leaving for later the arguments relating to the murder of Malcolm Wright, the Court considers Burks' arguments in the order presented by him.

### A. Count One – RICO Conspiracy

Much like Lucas, Burks argues that there was insufficient evidence to establish the RICO conspiracy alleged in Count 1. More specifically, he argues that the Government "could not, and did not, present one shred of evidence that Maurice Burks ever agreed to commit any crime with any member of the Gangster Disciples." (Doc. No. 1404 at 6). He claims the evidence, at best, showed he was a member of a gang (which Burks' counsel conceded during opening statement) but, as the Court instructed the jury, being a member of a gang is not itself unlawful.

This Court has already set forth plenty of evidence from which a jury could conclude that the Gangster Disciples is an enterprise for purposes of RICO, and the same is true of the deck that operated in Clarksville. More specifically as it relates to Burks, the evidence (construed in the Government's favor for purposes of a motion for judgment of acquittal) showed he:

(1) was a long-time member of the Gangster Disciples;

(2) served for a period as Regent, Coodinator, and Enforcer;

(3) attended numerous meetings, paid dues, and was identified on Gangster Disciples meeting and phone lists as Mac Reesy;

(4) attended a large organizational meeting in 2012 that focused on ways to increase membership in the Clarksville deck;

(5) was closely affiliated with Darden (the unquestionable ringleader of the 615 Region), and the two were often together and "like brothers," having both come from Guthrie;

(6) traveled with Darden to Murfreesboro to serve a violation on an errant gang member;

(7) sold 10.886 grams of cocaine on February 4, 2010 and 25.851 grams on February 26, 2010, and sold 11.4 grams of crack cocaine on December 17, 2010, as alleged in the Kentucky indictment;

(8) sold half- to one-ounce quantities of cocaine to Dowlen in 2012 and 2013, and sold cocaine to others at least 10 times during this period; and

(9) shot and killed Wright at C-Rays, a known Bloods' hangout, in retaliation for Hardison being sucker-punched earlier in the evening.

This evidence alone, if believed by the jury, was more than enough to conclude that Burks willingly joined, and continued to be a part of, the racketeering conspiracy alleged in Count One. Accordingly his motion for judgment of acquittal on the RICO conspiracy charge will be denied.

## B. Count Two – Drug Conspiracy

Like Lucas, Burks argues the evidence was insufficient to support the drug conspiracy alleged in Count Two. Like Lucas, he argues that the conspiracy in the Kentucky case was with a member of a different gang meaning that there were multiple conspiracy. And as with Lucas, this argument fails for the reasons already stated.

Burks also argues "the government presented no evidence connecting [him] in any way with the amount of cocaine for which the jury found him responsible"; the amount involved in the

Kentucky case is but "a small fraction" of that found by the jury in this case; and that "[t]he only conceivable explanation is that the jury accepted the government's invitation for them to 'imagine' how much more cocaine Mr. Burks may have sold."  (Doc. No. 1404 at 7).

There are at least two fundamental problems with this argument.  First, the Government did not invite the jury to "imagine" anything.  Instead, the Government presented the jury with what it purported to be a reasonable inference, to wit, that it would not be unreasonable for a self-professed, full-time drug dealer to sell his drug of choice (crack cocaine) in the same amount a couple of times a month.  "A prosecutor has 'leeway to argue reasonable inferences from the evidence' during closing arguments." United States v. Crosgrove, 637 F.3d 646, 664 (6th Cir. 2011) (quoting Byrd v. Collins, 209 F.3d 486, 535 (6th Cir. 2000)).  "In addition, [this Court] properly instructed the jury that arguments are not evidence and a jury is, of course, presumed to follow the instructions they are given." United States v. Beasley, 700 F. App'x 394, 398 (6th Cir. 2017) (citing United States v. Taylor, 814 F.3d 340, 365 (6th Cir. 2016)).

Second, whether Burks personally sold 280-grams of cocaine base is quite beside the point. As a member of a conspiracy, Burks is responsible for "'the drug quantities for which he is directly involved, and any quantity that is a reasonably foreseeable consequence of the conspiracy.'" United States v. Lang, 717 F. App'x 523, 547 (6th Cir. 2017) (quoting United States v. Anderson, 333 F. App'x 17, 25 (6th Cir. 2009)).   Accordingly, the jury was instructed that if it found a particular defendant guilty on the drug conspiracy count, it would then "determine for that defendant the type and quantity of the controlled substance(s) involved in the . . . drug conspiracy that was attributable to that defendant as the result of his own conduct and the conduct of other co-conspirators that was reasonably foreseeable to him."  (Doc. No. 1397 at 57).  The jury obviously followed this instruction

28

because it found that, while the RICO conspiracy involved 5 kilograms or more of cocaine, it was foreseeable to Burks that the drug conspiracy only involved between 500 grams and 5 kilograms of cocaine for purposes of Count Two. This finding is wholly supported by the evidence given the number of participants and the time frame involved. Sufficient evidence, therefore, supports Burks' guilty verdict on Count Two and his motion for judgment of acquittal on this basis will be denied.

## C. Pre-Indictment Delay

Burks' arguments regarding pre-indictment delay were thoroughly analyzed in this Court's Memorandum Opinion (Doc. No. 472) filed June 26, 2018. All Burks now adds is that "[k]nowing what it now knows, this Court should remedy this unconstitutional violation by granting [his] motion for a new trial or motion for judgment of acquittal." (Doc. No. 1404 at 15). As discussed in detail below, Burks will be granted a new trial, but not because of pre-indictment delay.

## D. Severance

Pre-trial motions to sever were filed by Burks, Hardison, and Luke and discussed in detail in this Court's first Memorandum Opinion and Omnibus Order (Doc. No. 823 at 36-44) filed November 2, 2018. That discussion is incorporated herein by reference. To that, the Court will simply add the following in response to Burks' post-trial motion:

(1) Burks complains about being lumped together with individuals that have "shared characteristics, such as race, age, and background." (Doc. No. 1404 at 16). The problem with that argument is self-evident: Gangster Disciples tend to be relatively young, lower-income, African American males.

(2) Burks complains about the "mountain of evidence presented against some of his co-defendants" compared to the evidence against him. (Id.). As previously noted, however, conspiracy

29

nets tend to catch both big and small fish. Besides, this argument would have been better-made by one of Burks' co-defendants. While Darden was unquestionably shown to be the leader, Burks was his sidekick, and the evidence of his knowing participation in the affairs and racketeering activities of the Gangster Disciples was substantial. Burks was not, as he seems to suggest, found guilty merely by association.

As for Burks argument about "cold-blooded murder of individuals" by Hardison who "was not even on trial," the fact remains that Hardison was a co-defendant and the murders were shown to be a racketeering activity of a conspiracy of which Burks was an integral part. Hardison's case was severed simply because he faced the death penalty that requires empanelment of a death-qualified jury.

(3) Burks never suggested a workable alternative to a joint trial. It seems that he would have been satisfied only if he were tried separately from everybody else. This runs counter to the "preference in the federal system for joint trials of defendants who are indicted together" inasmuch as "[t]hey promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." Zafiro v. United States, 506 U.S. at 535, 537 (1993). As the Court observed in its prior opinion:

> Were the Court to grant the motions to sever, this would require a minimum of four trials. In one, trial would be held against Hardison on Counts One, Five, Six, Seven, Eight, Nine, and Twelve. A second trial involving Burks would require trial of Count One again, plus, Counts Two, Ten, Eleven, Thirteen, and Fourteen. Yet a third trial, against would involve trying Count Ones and Two again, this time against Luke. Still a fourth trial against the remaining seven Defendants would involv[e] trying the RICO count for the fourth time, the drug conspiracy count for the third time, plus all of the other substantive counts in which Hardison, Burks and Luke are not named.

(Doc. No. 823 at 41). Regardless, and as this Court also pointed out, "the risk of prejudice to defendants in a joint trial is presumably low, because 'juries are presumed capable of sorting

30

evidence and considering separately each count and each defendant,'" <u>Caver</u>, 470 F.3d at 238. Nothing the jury did in this case suggests that it was unable to separate the evidence as to each Defendants. Accordingly, Burks is not entitled to either an acquittal or a new trial because he was jointly tried with the other Defendants who were named in both the RICO and drug distribution conspiracies.

**E. Not Allowing Defendant to Sit at Counsel Table**

As noted in relation to Lucas's motion, this issue has been adequately addressed by the Order (Doc. No. 1220) entered March 6, 2019. Although Burks now asserts that "[a]ll of the constitutional concerns raised by [him] regarding having the defendants sit behind counsel were legitimate and manifested themselves at his trial," and that the seating arrangement "impeded counsel in their efforts to effectively represent Mr. Burks at trial," (Doc. No. 1404 at 19), nothing is offered to support those bald assertions.

Having sat through the trial, the Court saw nothing that would indicate Defendants were impeded in discussing matters with their lawyers. To the contrary, the interactions between the lawyers and their clients appeared to be substantially the same as in the other cases this Court has tried where Defendants sit next to their lawyers which is, of course, "the Court's preference in an ideal world." (Doc. No. 1220 at 6). Further, not once did Defendants suggest that they could not adequately consult with their counsel.

**F. <u>Batson</u> Violation**

"Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process." <u>Flowers v. Mississippi</u>, ___ U.S. ___, ___, 139 S. Ct. 2228, 2242 (2019). As suggested in <u>Batson v. Kentucky</u>, 476 U.S. 79, 95 (1986), and made clear beyond peradventure of

doubt in Flowers, "[i]n the eyes of the Constitution, one racially discriminatory peremptory strike is one too many."  139 S.Ct. 2241.

Burks argues the Government violated Batson by using a peremptory challenge to strike Juror Number One.  This, he argues, deprived him of his Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

 The procedure used to analyze such a Batson challenge was recently summarized by the Sixth Circuit as follows:

> To establish a . . . violation under Batson, the claimant must first make a prima facie showing that the peremptory challenge was based on race.  If the claimant establishes a prima facie case, the party making the strike must articulate a race-neutral explanation for removing the juror in question.  This explanation "need not be particularly persuasive, or even plausible, so long as it is neutral." Once a race-neutral explanation is produced, the claimant must prove purposeful discrimination.  Purposeful discrimination may be shown by demonstrating that the proffered explanation is merely a pretext for racial motivation. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

United States v. Cleveland, 907 F.3d 423, 433 (6th Cir. 2018) (internal citations omitted). "Throughout the Batson inquiry, the ultimate burden of persuasion always rests with the party challenging the strike."  Id.

Beyond showing that Juror Number One was African American, Burks did not come close to carrying his burden of persuasion at trial, nor has he done so now.  When Burks raised the challenge, the Government proffered as its race-neutral explanation that Juror Number 1 stated that she would require the Government to prove Defendants guilty beyond *all* doubt as opposed to beyond a *reasonable* doubt.  This hardly suggests discriminatory intent and is unquestionably race neutral.  See Purkett v. Elem, 514 U.S. 765, 768 (1995) (holding that "unless a discriminatory intent is inherent in the [proponent's] explanation, the reason offered will be deemed race neutral"); Briggs

32

v. Grounds, 682 F.3d 1165, 1174 (9th Cir. 2012) (stating that holding "the prosecution to a higher burden of proof than the law required" is a valid, race-neutral reason for excluding a juror); Majid v. Portuondo, 428 F.3d 112, 118 (2d Cir. 2005) (observing that belief that those in technical fields might hold prosecution to higher standard can be a race neutral reason for a peremptory strike). While Burks attributes Juror Number One's response to the compound question posed by the Government and notes that the juror said she would follow the jury instructions about the burden of proof when asked by the Court, "rehabilitation does not preclude [peremptory] strikes." United States v. Samuels, 543 F.3d 1013, 1018 (8th Cir. 2008)

With the Government setting forth a race-neutral reason for striking Juror Number 1, the only question that remained was whether Burks showed intentional discrimination on the basis of race. Usually, but not always, this takes the form of a comparative analysis whereby jurors allegedly stricken by race are compared to jurors of another race who were not, with the only material distinction between the two being race. United States v. Atkins, 843 F.3d 625, 634 (6th Cir. 2016). Burks did not offer such a comparison at trial, nor does he do so now. Instead, he merely submits that because Juror Number 1 eventually said that she would follow the law as given to her by the Court, she was no different from "every other white juror who the Government did not strike." (Doc. No. 1457 at 18). This, of course, neglects to consider that, unlike any of the other jurors, Juror Number One told the Government that she would require the Government to "prove away speculative doubts," no matter that the Court would instruct otherwise. (Doc. No. 1431 at 172-73).

What Burks' argument really boils down to is that the Government had the temerity to strike an African American juror in a case involving African American defendants. This does not a Batson violation make. In fact, the Government's use of its peremptory strikes suggests the lack of any

discriminatory intent.   The Government was allowed 12 peremptory challenges for the 12 regular

jurors, and 3 peremptory challenges for the 6 alternate jurors.  The Government exercised its regular

strikes by striking 8 white men, 3 white women, and Juror Number 1, and used its peremptory strike

1 white male and 2 white females.  Simply put, there was no Batson violation and, consequently, no

need for a new trial because of the alleged discrimination in jury selection.

**G**.  **Brady Violation**

Burks complains that he was prejudiced in preparing for trial because "[t]his Court allowed

the government to withhold its most critical Brady material from Mr. Burks until February 15, 2019

- thirteen (13) days before trial."  (Doc. No. 1404 at 21).  Burks argument fails in light of the law

in this circuit.

After considerable wrangling between the Government and Burks, the Court entered an

Order on December 20, 2018 (Doc. No. 922) setting a February 1, 2019 deadline for the Government

to disclose Brady, Giglio, and Jencks Act material[24] for its witnesses, with the exception that the

Government could withhold that information until February 15, 2019 for 10-15 witnesses that it

deemed to be "highly sensitive" because of safety concerns.[25]  The Government complied with that

Order.

In his Motion, Burks spends seven pages laying out what lead up to and followed the

---

[24]  Brady v. Maryland, 373 U.S. 83, 88 (1963) requires the government to disclose evidence in its possession if such evidence is favorable to the defendant and material to guilt or punishment.  It was extended in Giglio v. United States, 405 U.S. 150 (1972), to require the government to disclose impeachment evidence where the "reliability of a given witness may well be determinative of guilt or innocence." Id. at 154 (internal quotation marks and citation omitted).  The Jencks Act, 18 U.S.C. § 3500, requires the Government to produce statements or reports made by a government witness.

[25]  By the February 1, 2019 deadline, the Government was also required to provide the Court with the names of the "highly sensitive witnesses," together "with a brief summary of their expected testimony and the reasons why they are deemed to be 'highly sensitive[.]'" (Doc. No. 922 at 3).

34

establishment of the Brady doctrine by the Supreme Court in 1963, only to acknowledge that "the Sixth Circuit has ruled that when evidence constitutes both Brady material and Jencks material, that the time frame for requiring disclosure is controlled by the Jencks Act." (Doc. 1404 at 28). Nevertheless he argues, "[r]espectfully," that "the Sixth Circuit is wrong" because "'Congress may not legislatively supercede our decisions interpreting and applying the Constitution.'" (Id. quoting Dickerson v. United States, 530 U.S. 428, 437 (2000)). Id.

While Burks is certainly entitled to his opinion, this Court is bound by controlling Sixth Circuit precedent, which, as Burks acknowledges, establishes that "[w]hen Brady material sought by a defendant is covered by the Jencks Act . . . the terms of that Act govern the timing of the government's disclosure.'" United States v. Davis, 306 F.3d 398, 421 (6th Cir. 2002) (quoting United States v. Bencs, 28 F.3d 555, 561 (6th Cir. 1994); accord, United States v. Brazil, 395 F. App'x 205, 215 (6th Cir. 2010); United States v. Presser, 844 F.2d 1275, 1283 (6th Cir. 1988). Under the express terms of the Jencks Act, this means that such disclosure is not necessary "until [the] witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). More than that, Rule 16 of the Federal Rules of Criminal Procedure, which governs discovery in criminal cases, "'provides no authority for compelling the pre-trial disclosure of Brady material, or of any other evidence not specifically mentioned by the rule.'" United States v. Warshak, 631 F.3d 266, 327 (6th Cir. 2010) (quoting Presser, 844 F.2d at 1284). Accordingly, there was no Brady violation as that doctrine is applied in the Sixth Circuit, and Burks was fortunate to receive the impeachment material as early as he did.

## H.  Prosecutorial Misconduct and Closing Arguments

Burks asserts that his right to a fair trial under the Sixth Amendment was denied because the

Government engaged in misconduct when it asked questions of Austin about why he was nervous, when it asked ATF Agent Wayne Kilday whether witness-informer Carlos Jordan's "life was in danger," and when it asked the jury to speculate about the amount of drugs Burks was responsible for distributing. The first and the last argument have been adequately covered in this Memorandum Opinion in relation to the same argument raised by Lucas.

As for Kilday's testimony, some context is necessary. During the course of its direct examination, the Government asked Kilday whether Jordan (who unbeknownst to the jury was in the Witness Protection Program) had been relocated. When Kilday responded in the affirmative, the Government asked why, to which Kilday replied "his [Jordan's] life was in danger," and the ATF had "[d]etermined that Gangster Disciple members were trying to find him to have him report to their security." (Rough Trans. 4/1/2019 at 174). This prompted Burks to move for a mistrial, which the Court denied. His present request for a new trial based on Kilday's response fares no better.

It is true, as Burks argues, that there was no evidence that he threatened Jordan. But, and leaving aside the witness intimidation allegations in the RICO conspiracy count, it is also true that Kilday never said Burks did.

Regardless, Burks argument about prejudice from Kilday's response ignores Jordan's own testimony that he thought his life was in danger when he absconded with the Clarksville box containing approximately $2,000. He learned though cell phone calls and texts that Darden, Vossie Fitts a/k/a Mac Vossie (who was then Darden's assistant, but had been an Enforcer), and Mac Tay (who was the Chief Enforcer for the state) wanted to meet with him ostensibly so that he could turn in the box. In Jordan's view, being summoned to meet with security members was disconcerting, particularly because local treasurers usually surrender their box to the state treasurer. Accordingly,

Jordan reported his concerns to Agent Kilday, his handler, and Sam Day of the Murfreesboro Police Department, who then decided to relocate Jordan to Alabama. Given Darden's participation, this evidence was admissible to all Defendants as a racketeering act for purpose of the RICO conspiracy charge.

Furthermore, Burks neglects to consider that, in a sidebar conference, the Government explained its reasoning for asking Kilday the question. Specifically, the Government stated that it asked about the threat because it anticipated Defendants would inquire about the funds paid by the ATF for Jordan's protection, and Jordan's unlawful possession of a firearm while under the ATF's control. "'It may sometimes be useful . . . to develop impeaching matter in direct examination of a 'friendly' witness in order to deprive an adversary of the psychological advantage of revealing it to the jury for the first time during cross-examination.'" United States v. Berry, 290 F. App'x 784, 789 (6th Cir. 2008) (quoting United States v. Cosentino, 844 F.2d 30, 33 (2d Cir. 1988)). It certainly was here, and the Government did not engage in misconduct warranting a new trial.

## I. Admission of Prior Conviction

Burks contends that the admission of his conviction in the Western District of Kentucky and his trial and ultimate conviction here constitute double jeopardy in violation of the Fifth Amendment. That argument was addressed and resolved in this Court's first Memorandum Opinion and Omnibus Order (Doc. No. 823 at 9-15) filed November 2, 2018.

Burks also argues that his conviction in the Kentucky case should not have been admitted because it was the product of the ineffective assistance of counsel inasmuch as counsel in that case did not warn Burks that his conviction could be used in a subsequent RICO prosecution. That argument was addressed and resolved in this Courts Third Memorandum Opinion and Omnibus

Order (Doc. No. 1119 at 2-4) filed February 8, 2018.

**J. Charges Related to the Killing of Malcolm Wright**

Counts Ten, Eleven, Thirteen and Fourteen of the Indictment involve crimes that were charged as a result of the murder of Malcolm Wright on November 3, 2012.[26]  Specifically, the Indictment alleges that, on that date Burks, a convicted felon, unlawfully possessed ammunition (Count Ten); committed murder in the aid of racketeering (Count Eleven); used, carried, brandished and/or discharged a firearm in relation to a crime of violence (Count Thirteen); and caused death through the use of a firearm (Count Fourteen).  The jury found Burks guilty on each count.

Burks argues that he is entitled to a judgment of acquittal because the evidence was insufficient to find that he murdered Wright.  As an alternative, he request a new trial.

As the Court observed at the beginning of this opinion, the standard of review for judgment of acquittal  and new trial motions are different.  Stated simply, Rule 29 and its "sufficiency of the evidence standard 'asks whether any rational tier of fact could have found the essential elements of the crime beyond a reasonable doubt,' not whether the trial judge himself believes the manifest weight of the evidence supports the verdict." United States v. Mallory, 902 F.3d 584, 596 (6th Cir. 2018) (citation omitted).  Rule 33 and it "manifest weight standard" on the other hand,  requires the trial judge to "weigh[] evidence and mak[e] credibility determinations first hand to ensure there is not a miscarriage of justice." Id.  Thus, "in deciding the new-trial motion, the district court ha[s] to take on a different role than when reviewing the acquittal motion: the district court ha[s] to act as the 'thirteenth juror . . . to ensure there ha[s] not been a miscarriage of justice." United States v.

---

[26]  Count Twelve charges that Darden, Hardison, and Jenkins assaulted, or aided and abetted in Wright's assault that led to serious bodily injury.  Darden was acquitted of that charge.  (Doc. No. 1360 at 3).

Paulus, 894 F.3d 67, 278 (6th Cir. 2018).

In most cases, the result is the same no matter which standard is applied. Here, however, the difference in standards is outcome determinative: the jury had sufficient evidence before it to find Burks guilty of the crimes surrounding the murder of Wright, but its weighing of the evidence that resulted in his conviction on those counts represents a miscarriage of justice. Prior to explaining the Court's reasoning behind that conclusion, a preliminary matter must be addressed having to do with an alleged inconsistent verdict on Count Thirteen.

### 1. *Inconsistent Verdicts*

The jury's verdict on Count Thirteen is as follows:

5. With respect to Count Thirteen of the Indictment, which charges Brandishing, Discharging, Using, and Carrying a Firearm During and In Relation to a Crime of Violence, that is, the Murder in Aid of Racketeering of Malcolm Wright charged in Count Eleven, we, the Jury, unanimously find the Defendant, Maurice Duncan Burks:

Guilty    __✔__        Not Guilty   ____

If you find the Defendant guilty of Count Thirteen, proceed to the question below.

If you find the Defendant not guilty of Count Thirteen, skip this question and proceed to the next count

(1) We, the Jury, further unanimously find that a firearm was used during and in relation to the murder in aid of racketeering of Malcolm Wright in the following ways (check every type of use of the firearm that applies).

    __✔__   Used and carried a firearm

    __✔__   Brandished a firearm

    ____   Discharged a firearm

(Doc. No. 1362 at 4).

In his reply brief, Burks insists the jury's verdict on Count Thirteen "presents one of the very few, but critically important to our constitutional standards of justice, cases in which a motion for judgment of acquittal not only may, but must, be granted." (Doc. No. 1457 at 29). It does not.

The Supreme Court has observed that "[i]nconsistent verdicts . . . present a situation where 'error' . . . most certainly has occurred, but it is unclear whose ox has been gored." United States v. Powell, 469 U.S. 57, 65 (1984). "Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course[.]" Id. It is even less satisfactory to conclude that a judgment of acquittal must be entered in such circumstances.

Because of "the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts," id. at 67, the Sixth Circuit has "repeatedly recognized the proposition that inconsistent verdicts in a criminal case generally are not reviewable," United States v. Randolph, 794 F.3d 602, 610 (6th Cir. 2015). There are, however, two limited exceptions to this rule: "where jury verdicts 'are marked by such inconsistency as to indicate arbitrariness or irrationality,'" or "where a guilty verdict on one count necessarily excludes a finding of guilt on another.'" Id. at 610-11 (quoting United States v. Lawrence, 555 F.3d 254, 263 (6th Cir. 2009)). Neither exception applies here.

The differences in the verdicts are not necessarily arbitrary or irrational because "[i]t is equally possible that the jury, convinced of guilt, properly reached its conclusion on [one] offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion" on the other. Powell, 469 U.S. at 65. Nor does the failure to find that Burks discharged a weapon exclude the finding that he committed the other crimes arising out of Wright's murder because (with the possible

40

exception of Count Fourteen) they do not require, as an element of the offense, the discharge of a firearm. See, United States v. Stetler, 526 F. App'x 631, 635 (6th Cir. 2013) (observing that where "crimes alleged in each count require proof of entirely different elements," the "acquittal of one does not necessarily render conviction of the other inconsistent").

### 2. Wright's Murder

Only a handful of facts are undisputed regarding Wright's murder at C-Ray's on November 3, 2012. Earlier that evening, Ford, a member of the Vice Lords, sucker-punched Hardison while the two were at Sidelines, a local club. This led to a fight between Hardison and several members of the Bloods gang. It also led to Hardison being forcibly evicted from Sidelines.

Among those at Sidelines that night were Wright, a Bloods member with the nickname XGotti, and his girlfriend, Kristine Gaskin. After the fight, Wright and Gaskin went to C-Ray's, a small club where Bloods hung out. C-Rays was packed. Gaskin saw a group of people come into the club, and a fight breaks out. Shots were then fired, and Gaskin found Wright holding his stomach. Wright crawled out the front door. He was taken to the Blanchfield Army Hospital, where he was later pronounced dead.

The Government fleshed out these facts by presenting the jury with the following evidence:

(1) According to Dowlen, on the night of Wright's murder, Darden called Dowlen and told him that Hardison had been "jumped," and that he (Darden) was ordering an "all hands on deck," requiring members to report to C-Rays.

(2) According to AT&T records, Hardison called Burks several times after being assaulted at sidelines, as well as after Wright's murder. Telephone records also showed that Burks called Hardison and other Gangster Disciples members after the murder, including Jenkins and Lucas.

(3) According to Daniels, he overheard a conversation among Gangster Disciples members outside C-Rays where a "plan" was formulated to "execute" a Bloods gang member inside C-Rays who had been "dissing" the Gangster Disciples. Burks was

41

present for that conversation.

(4) According to Gaskins, Hardison confronted Wright in C-Rays just before the murder and asked him whether he was a Blood before assaulting him. Thereafter, multiple Gangster Disciple members began assaulting Wright.

(5) A .45 caliber cartridge casing was recovered at the scene of Wright's murder.

(6) According to Daniels, several weeks after Wrights' murder, Burks told Gangster Disciples member Desmond Garret, "You keep playing around, I'm going—I'm gonna do you like I did—I'm gonna do you like I did that nigga at C-Ray's."

(7) According to Danyon, while at the cave in Guthrie, he, Hardison, Darden, and Burks watched a video of an interview with the security guard at C-Ray's, and Burks "confessed" to the murder. Burks also allegedly said that the .45 weapon he used was the "twin" to the one he was then carrying.

(8) According to Ford, Burks confessed to killing Wright while the two were housed in the Grayson Detention Center

Viewed with the prism of Rule 29 and its requirement that the evidence be considered in a light favorable to the Government, this evidence is more than sufficient to find Burks guilty of the charges arising from Wrights' murder. Not only did Burks essentially confess on three separate occasions to three different people, responding to the scene and exacting revenge after a call for "all hands on deck" is a centerpiece of the code that the Gangster Disciples live by.[27]

Looking at this evidence in the role of a thirteenth juror where the evidence can be weighed, however, the Court finds too many holes to let these convictions stand. Indeed, the only evidence even putting Burks on the scene of the murders – let alone with a gun in his hand – is the three supposed confessions. Each is problematic in several respects.

With obvious pride and a grin on his face, Danyon told the jury that he was referred to as "Danger Dan" because he was known to be a "dangerous man." (Rough Trans. 3/18/2019 at 125).

---

[27] Even so, and even though Darden is the one who gave the "all hands on deck" order, the jury acquitted him of assaulting Wright.

Truer words were never spoken as it pertained to the Defendants on trial.

Danyon testified for several days, was the Government's star witness, and had a lot to say about the Gangster Disciples. Although Danyon was in and out of jail for much of the time period covered by the Indictment, the jury could believe that Danyon testified credibly about the Gangster Disciples generally, and about the role Defendants played in that organization in the 615 region. Dowlen was, after all, a long-standing member of the Gangster Disciples, having been blessed-in while he was incarcerated in the late 1990's, and having reaffirmed his commitment to the cause in the early 2000's. While generally credible when painting the big picture, Dowlen's credibility dropped markedly when discussing details. This is best exemplified by his testimony relating to Burks' alleged involvement in Wright's murder.

Dowlen testified that, on the run from a murder charge, he hid out in the cave in Guthrie. Sometime in December 2012 or January 2013, discussions at the cave turned to the shooting at C-Rays, and Burks began speaking about a security guard who had been interviewed after the shooting. Using his cell phone, Burks found a video of the interview on YouTube and showed it to Dowlen, Darden, and Hardison, who were also present. According to Dowlen, "it [the video] showed at the end – it was like in the end it showed where XGotti was found at the back of the – the back of C-Ray's exit on a – on like a deck, where he was found shot, I guess, deceased: There is crime scene tape around it." (Rough Trans. 3/18/2019 at 88). The questioning and answers continued as follows:

Q. What happened next, Mr. Dowlen?

A. I proceeded – I was – I was kind of – I was – I was shocked because this whole time – the whole time that that had happened, I never – I never knew that – that what had – that's what happened or none of that. I was under the assumption that Mr. Hardison had shot him.

43

Q. Did you do anything or did you ask Mr. Burks any questions at that point?

A. Nah, I didn't ask – I don't remember calling – recall – I don't remember asking him any questions. I just turned to Mr. Hardison and said, you know, this whole time I thought you – you shot him.

Q. Was Mr. Burks armed at the time?

A. Yes.

Q. What was he armed with?

A. He had a – a compact .45.

Q. A .45 caliber pistol?

A. Yes.

Q. And after he made those statements to you, did you ask him anything about the pistol he had?

A. Yes. I asked him, is that the pistol right there, because I know he kept a – a similar .45 on him. And he told me, nah, this is a twin to that. I said oh, I was under the assumption that Mr. Darden [sic?] had got away with his gun . . .

(Id. at 99-100). On cross examination, in response to the question of whether Burks told him he shot

Wright, Dowlen responded:

A. I – I said that Mr. Burks stated that. Once we was watching the video and seen that they showed on the video that he made it to the back deck of C-Ray's, that Mr. Burks stated he a bad mother F. He made it out there. I hit him in his head once and he was still crawling. I hit him again and he still made it out there.

(Id. at 180).

As interesting as Dowlen's testimony was, it does not square with the facts, although the

reference to the "twin" .45 caliber pistol was admittedly a nice added touch.[28]  Dowlen testified

---

[28]  It may be that twin .45's were common.  According to Austin, Darden allegedly told him that he had a "twin" to the .45 that Doyle Cammon a/k/a "Lil Kevin" carried.  (Rough Trans. 3/26/19 at 98).

Burks said that he shot Wright in the head, but Dr. David Zimmerman of the Davidson County Medical Examiner's Office testified that Wright was shot in the abdomen and the leg, and that Wright did not sustain a head injury. Dowlen also suggested that Wright was shot and found by the back door of C-Rays, but both Gaskin, and Terry Minton, the Commander of the Clarksville Police Department Crime Scene Unit, testified that Wright went out the front door of C-Ray's.

The Government tries to explain these discrepancies away. For example, it argues that Burks may have said he shot Wright in the head so as "to appear particularly 'tough' in front of his fellow Gangster Disciples in order to increase his reputation for violence within the gang." (Doc. No. 1443 at 36). Then again, the exact same argument could be made if Burks did *not* shoot Wright at all – he could simply claim to have shot him in the head to gain stature and increase his reputation.

The Government also argues that Burks' purported confession that Wright was shot in the head at the back door is not inconsistent with the evidence because Burks did not say Wright *exited* via the back door. All he really said was that "Wright managed to get to the back door of the club, seemingly after Burks had shot him in the head." (Id.. at 37). Problem is, this scenario is in direct conflict with Gaskin's testimony that, after Wright was shot the first time, he crawled towards the front of C-Ray's and was then shot in the *front* entryway by the same shooter. This shooter, not incidentally, was described by Gaskin as being of "medium height." Burks is 6"4."[29] In a war of credibility between Gaskin and Dowlen, Gaskin wins hands down. She certainly wanted to see justice for Malcolm's killer, but she also had no need to curry favor from the government.

Nor does Dowlen's trial testimony square with what he had told authorities in the past. In

---

[29] The Court does not recall specific evidence being introduced about Burks' height. Nevertheless, the Government does not challenge Burks' representation as to his height. Further, all Defendants stood when the jurors entered and exited the courtroom and jurors would have easily noticed that Burks, by any definition, is not of "medium" height.

a statement to agents, Dowlen said that Hardison probably killed Wright. Later, Dowlen changed course and pinned the blame on Burks. The Government explains this discrepancy as resulting from "Dowlen's mere prior speculation" being "later debunked." (Doc. No. 1443 at 36). Elsewhere, the Government asserts that Dowlen "was surprised by [Burk's] admission to Wright's murder because, until that point, Dowlen had assumed that Hardison had killed Wright." (Id. at 27). Maybe so, but the "surprise" revelation from Burks allegedly occurred at the cave in December 2012 or January 2013. The Government provides no explanation as to why Dowlen held on to his (now debunked) assumption for more than a year when he told agents in January 2014 that Hardison "probably" killed Wright. Nor does the Government offer a plausible explanation for why Dowlen waited yet another year thereafter to reveal Burks's supposed confession.[30]

The second person to have allegedly heard Burks confess is Ford. Beyond the questionable reliability of jailhouse snitches generally, see Zappulla v. New York, 391 F.3d 462, 470 n. 3 (2d Cir. 2004), Ford's testimony presents its own set of problems.

According to Ford, on the same day he got sentenced by Judge Trauger in an unrelated case he went up to Burks at the Grayson County Jail and asked, "What's up bruh?," prompting the following exchange between him and Burks:

> He [Burks] was like -- first thing he asked me about was my brother. I told him I just got sentenced. And I explained to him, my brother got severed away from the case.
>
> And he was like, "Yeah?"
>
> And I was explaining to him what happened and how much time I got, and how I got

---

[30] In response to Burks' argument about pre-indictment delay, the Government states that "it was not clear until at least May 2015 that [Burks] had admitted to Dowlen that [Burks] had murdered Wright." (Doc. No. 1443 at 44). That may be true from the Government's perspective but, if Dowlen is to be believed, he knew more than two years earlier that Burks "confessed" and, therefore, lied to agents when he continued to blame Hardison.

eight years, nine months, 105 months. He was, "Like, damn. For a bad motherfuck?" I said, "Yeah."

He said, "Damn. I hope they don't come get me on a bad mother fuck'."

(Rough Trans. 3/25/19 at 233). Ford then explained that he understood the term "bad motherfucker" to mean "the murder case." (Id.). Ford did not report this putative confession until years later, even though he had been cooperating in other investigations.

At this point it is important to recall that (1) Ford is a member of the Vice Lords, (2) the Gangster Disciples and Vice Lords are archenemies who compete for territory, (3) Ford is the one who sucker-punched Hardison at Sidelines, and (4) the jury heard about a number of murders over the course of the trial. Nevertheless, from this testimony, the jury was expected to believe that Burks voluntarily confessed to Ford that he killed Wright. Even accepting the Government argument that some sort of kinship existed between Burks and Ford because Ford's brother, Deonte Graham a/k/a Mac Red, is a Gangster Disciple, the jury would have to make several large leaps to conclude that Burks confessed to Ford that he killed Wright.

As stated at the very outset, the Court learned a lot about the language used by Gangster Disciples members, and also learned that use of the word "motherf*****" is not uncommon. However, the first time and only time the Court recalls "bad motherf***" being used as a synonym for murder was during Ford's testimony. While the Government points out that "the same words, notably" were used by Burks "in describing the murder to Dowlen," (Doc. No. 1443 at 25), all Burks allegedly did was describe Wright as a "bad motherf******." The two hardly equate.

Moreover, not only would the jury have to believe that Burks decided to forgo the gang rivalry in speaking to Ford and also believe that Burks chose a relatively unique way to say murder, the jury would also have to assume that Burks was referring to Wrights' murder. Why this would

47

be so is not made clear by the Government.

Finally on the issue of credibility is Ronnie Daniels' testimony or, more specifically, the lack thereof. Daniels, as noted, was unresponsive when questioned at trial, held in contempt, and then retook the stand. Upon retaking the stand, his recollection did not improve so the jury was left with what Daniels told the grand jury.

The Government is correct that a witness's "'limited and vague recall of events, equivocation, and claims of memory loss' can constitute prior inconsistent statements under Fed. R. Evid. 801(d)(1), and thus such statements allow the witness' prior inconsistent grand jury testimony to be admitted as substantive evidence." United States v. Mayberry, 540 F.3d 506, 516 (6th Cir. 2008) (quoting United States v. Hadley, 431 F.3d 484, 511-12 (6th Cir. 2005)). But what the jury should make of this testimony is another matter altogether. The trial jury in this case had no way to assess Daniels' credibility, other than to conclude that he probably would rather be any place but on the witness stand.

Credibility problems aside, Burks' convictions on the counts relating to Wright's murder were not helped by the investigation that followed the shooting. Sgt. Minton, the Commander of the Clarksville Police Department's Crime Scene Unit, testified that the unit was shorthanded and so he had to assume several roles. When he arrived on the scene, there were several patrons still milling about inside C-Ray's that was "not normal for us" because they liked to have everybody "cleared out so nothing gets disturbed." (Rough Trans. 3/21/2019). Although officers were instructed to clear the scene, that did not occur, as evidence by a photograph that was introduced showing a lady standing behind the cash register. Whether that woman was interviewed, or any of the six to seven other civilians that were in C-Rays when Minton arrived, Minton could not say.

Dozens of photographs were taken at the scene and introduced at trial. However, little physical evidence was introduced that had any bearing on Burks' involvement or non-involvement, beyond photographs showing blood spots toward the front of the club (confirming Gaskin's testimony), and a .45 caliber casing that did not match the gun Burks was carrying when he was arrested on January 26, 2013. Maybe Burks had a twin .45, maybe Burks disposed of that twin gun in the days or weeks between his alleged confession to Danyon and his arrest on unrelated charges, and maybe the cartridge casing from the twin .45 would have matched the casing recovered at C-Ray. Or, maybe not.

The Court does not know whether Burks killed Wright at C-Rays on November 12, 2012. What the Court does know, however, is that proof beyond a reasonable doubt is a standard not to be trifled with. "When the government has presented enough evidence for a conviction but the judge disagrees with the jury's resolution of conflicting evidence, a reversal is appropriate on the ground that the verdict is against the manifest weight of the evidence." United States v. Lyimo, 574 F. App'x 667, 671 (6th Cir. 2014) (citing United States v. Lutz, 154 F.3d 581, 589 (6th Cir. 1998)). That is the case with respect to Burks' convictions on the counts relating to the murder of Wright and those convictions will be vacated pending a new trial.

### III. Conclusion

On the basis of the foregoing, the Motions for Judgment of Acquittal filed by all Defendants will be denied, as will Lucas's Motion for a New Trial. Burks' Motion for a New Trial will be granted solely with respect to Counts Ten, Eleven, Thirteen, and Fourteen, and a new trial date on those counts will be set.

49

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE